NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-4760-14T1
 A-0164-15T1

IN RE: ACCUTANE LITIGATION

___________________________________________________

 Argued May 16, 2017 – Decided July 25, 2017

 Before Judges Fisher, Ostrer and Moynihan.

 On appeal from the Superior Court of New
 Jersey, Law Division, Atlantic County, Case
 No. 271 (MCL).

 Bruce D. Greenberg argued the cause for
 appellants in A-4760-14 (Seeger Weiss, LLP,
 Lite, DePalma, Greenberg, LLC, and Weitz &
 Luxenberg, PC, attorneys; David R. Buchanan
 and Peter Samberg, on the brief).

 Mary Jane Bass (Beggs & Lane) of the Florida
 bar, admitted pro hac vice, argued the cause
 for appellants in A-0164-15 (Seeger Weiss,
 LLP, Lite, DePalma, Greenberg, LLC, Weitz &
 Luxenberg, P.C., and Ms. Bass, attorneys;
 David R. Buchanan and Peter Samberg, on the
 brief).

 Paul W. Schmidt (Covington & Burling LLP) of
 the District of Columbia bar, admitted pro hac
 vice, argued the cause for respondents (in A-
 4760-14) and respondents/cross-appellants (in
 A-0164-15) Hoffmann-La Roche Inc. and Roche
 Laboratories Inc. (Gibbons P.C., Dughi Hewit
 & Domalewski, P.C. and Mr. Schmidt, attorneys;
 Michelle M. Bufano, Natalie H. Mantell,
 Russell L. Hewit, Mr. Schmidt, and Michael X.
 Imbroscio (Covington & Burling LLP) of the
 District of Columbia bar, admitted pro hac
 vice, on the brief).

 Edward J. Fanning, Jr., argued the cause for
 amicus curiae The HealthCare Institute of New
 Jersey in A-4760-14 (McCarter and English,
 LLP, attorneys; Mr. Fanning and David R. Kott,
 of counsel and on the brief; Gary R. Tulp, on
 the brief).

PER CURIAM

 These two appeals, calendared back-to-back, stem from orders

entered in this multicounty litigation (MCL). The first (A-4760-

14) concerns eighteen cases in which plaintiffs alleged that, on

various dates after April 10, 2002, they were prescribed and

ingested Accutane, a prescription acne drug manufactured by

defendants Hoffman-La Roche Inc. and Roche Laboratories Inc.

(collectively "defendants") in New Jersey. By that time, the

Accutane package insert or label had been amended to provide that

the drug had been "associated with inflammatory bowel disease."

In these cases, plaintiffs allege they developed ulcerative

colitis (an inflammatory bowel disease or IBD) from taking the

drug; the judge determined – by way of summary judgment – that the

post-2002 Accutane warnings were adequate as a matter of New Jersey

law.

 The second appeal (A-0164-15) concerns the dismissal of 514

Accutane complaints involving plaintiffs who were prescribed and

 2 A-4760-14T1
ingested Accutane in jurisdictions other than New Jersey. These

plaintiffs alleged they developed ulcerative colitis from

ingesting the drug and that the post-2002 warnings were inadequate.

In part one of a two-part opinion, the trial judge granted

defendants' omnibus motion for summary judgment by applying New

Jersey law. The judge did not conduct a choice-of-law analysis in

this part of his decision; instead he found New Jersey law applied

because of counsel's representations in the 2005 MCL petition. In

part two of his opinion, the judge held that if the law of other

jurisdictions applied to these out-of-state plaintiffs, he would

have granted defendants' motion for summary judgment dismissing

394 of the cases under the laws of twenty-one of the jurisdictions,

denied the motion as to 101 cases under the laws of twenty other

jurisdictions, and granted the motion dismissing the remaining

nineteen cases because the law of the state of injury in three

jurisdictions was so unclear New Jersey law should apply.

 In this second appeal, plaintiffs argue the trial judge erred

in applying or interpreting New Jersey law and, also, that the

substantive law of the other jurisdictions required a denial of

summary judgment.1 In their cross-appeal, defendants argue the

1
 All of the cases reviewed to date, except Kendall v. Hoffman-La
Roche, Inc. (Kendall I), No. A-2633-08 (App. Div. Aug. 5, 2010),
aff'd, 209 N.J. 173 (2012), involved the 1984 Accutane warning. In

 3 A-4760-14T1
judge erred in his alternative disposition denying summary

judgment in 101 of the cases. We turn first to the issues in A-

4760-14 and then to those posed in A-0164-15.

 I

 In considering the issues raised in the first appeal, we

first (a) discuss the background of these cases, (b) the evidential

materials urged in opposition to summary judgment and the trial

judge's determination, (c) the general legal principles followed

when applying New Jersey products liability law to a claim based

on the use of a pharmaceutical drug, and (d) the application of

New Jersey law to these eighteen suits. In addition, even though

unnecessary to our determination, we briefly discuss (e)

plaintiffs' argument that the law-of-the-case doctrine barred the

trial judge's summary judgment ruling.

 A

 (1)

 By way of background, we briefly observe that, in 2005, the

Supreme Court designated all pending and future statewide actions

Kendall, which has settled, the plaintiff received the 1984 warning
when she began taking Accutane in 1997, and received the amended
post-2002 warning after her diagnoses with ulcerative colitis. 209
N.J. at 182-86. Only one post-2000 warning case, Tanna v. Hoffman-
La Roche, Inc., ATL-L-3366-04, was tried; that case resulted in a
hung jury and has not been retried.

 4 A-4760-14T1
involving Accutane as a mass tort pursuant to Rule 4:38A; all

cases were transferred to Atlantic County to be heard on a

coordinated basis. From 2007 to 2008, trials were conducted in the

three bellwether cases; those juries found the 1984 warning, which

warned that Accutane had been "temporally associated" with IBD,

was inadequate. McCarrell v. Hoffman-La Roche, Inc. (McCarrell I),

No. A-3280-07 (App. Div. 2009), certif. denied, 199 N.J. 518

(2009); Kendall I, supra, 209 N.J. at 182-86 (post-2000 warning

received after diagnosis); Sager v. Hoffman-La Roche, Inc., No.

A-3427-09 (App. Div. 2012), certif. denied, 213 N.J. 568 (2012).2

 On March 20, 2008, Judge Carol Higbee denied defendants'

omnibus motion for summary judgment on the adequacy of the post-

2000 package insert warning in seventy-eight MCL cases, including

Tanna v. Hoffman-La Roche Inc., No. ATL-L-3366-04 (applying

California law), Alfano v. Hoffman-La Roche Inc., No. ATL-L-2650-

07, and Phillips v. Hoffman-La Roche Inc., No. ATL-L-1909-07 (a

2
 We recognize that, as a general matter, Rule 1:36-3 precludes
the citation of unpublished opinions by our courts. That Rule,
however, provides an exception for the citation of unpublished
opinions when necessary for, among other things, res judicata and
collateral estoppel purposes. Although the Rule may not have
contemplated the use of an unpublished opinion in one or more
cases within a larger group of collectively-managed cases, such
as in this MCL litigation, we deem it appropriate not only to
refer to some of our unpublished opinions for reasons expressed
in the Rule's exceptions, but also to point out that the trial
judge remains bound to those unpublished opinions because they
arose out of the same MCL litigation.

 5 A-4760-14T1
subject of this appeal). We denied defendants' motion for leave

to appeal.

 On December 10, 2008, Judge Higbee denied defendants' omnibus

motion for summary judgment on the adequacy of the post-2001

warnings in eighty-four MCL cases, including Alfano, Tanna, and

Phillips. We denied defendants' motion for leave to appeal.

 On January 16, 2009, Judge Higbee denied defendants' omnibus

motion for summary judgment in twenty-four cases filed by New

Jersey plaintiffs, including Phillips, on the adequacy of some of

the pre- and post-2000 warnings. And, in June 2010, Judge Higbee

denied defendants' motion for summary judgment based on federal

preemption in Weathersbee v. Hoffman-La Roche, Inc., No. ATL-L-

3260-04 and Falco v. Hoffman-La Roche, Inc., No. ATL-L-2646-08

(applying North Carolina law), where the plaintiffs received post-

2001 warnings.

 Juries found the 1984 warning inadequate in four subsequently

tried cases. McCarrell v. Hoffman-La Roche, Inc. (McCarrell II),

No. A-4481-12 (App. Div. 2015), rev'd and remanded, 227 N.J. 569

(2017); Kendall v. Hoffman-La Roche, Inc. (Kendall II), No. A-0301-

14 (App. Div. 2016); Gaghan v. Hoffman-La Roche, Nos. A-2717-11,

A-3211-11, A-3217-11 (App. Div. 2014); and Rossitto v. Hoffman-La

Roche, Inc., No. A-1236-13 (App. Div. 2016), certif. denied, 228

N.J. 419 (2016).

 6 A-4760-14T1
 Meanwhile, on various dates from 2007 to 2013, the eighteen

plaintiffs in the first appeal at hand – plaintiffs who ingested

Accutane in New Jersey after April 10, 2002 – filed MCL complaints

against defendants seeking damages for, among other things, a

failure to warn under the New Jersey Product Liability Act (PLA),

N.J.S.A. 2A:58C-1 to -11.

 In January 2015, defendants moved for summary judgment in

Alfano on the adequacy of the post-2002 warnings under either New

Jersey or Washington law. Alfano, however, dismissed her case with

prejudice for unrelated reasons, prompting defendants to file an

amended notice of motion for summary judgment (the subject of this

appeal) based on the adequacy of the warnings in all MCL cases

where plaintiffs first ingested Accutane after April 10, 2002.

 On April 2, 2015, the newly-designated Accutane trial judge

issued a written opinion finding the post-April 10, 2002 Accutane

warnings were adequate as a matter of law under the PLA. An order

dismissing those eighteen cases was entered on May 11, 2015.

 (2)

 In light of the familiar Brill standard,3 which applies with

equal vigor in our review of summary judgment determinations,

Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of

3
 Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995).

 7 A-4760-14T1
Pittsburgh, 224 N.J. 189, 199 (2016), we consider the following

facts and circumstances in the light most favorable to plaintiffs.

Brill, supra, 142 N.J. at 540.

 In 1982, the Food and Drug Administration (FDA) approved

defendants' new drug application (NDA) to market Accutane, "known

generically as isotretinoin, for the treatment of recalcitrant

nodular acne." McCarrell II, supra, 227 N.J. at 577. The drug is

a retinoid, derived from vitamin A, and is highly effective in

treating severe acne. Kendall I, supra, 209 N.J. at 180.

 There is no dispute that Accutane "has a number of known side

effects, including dry lips, skin and eyes; conjunctivitis;

decreased night vision; muscle and joint aches; elevated

triglycerides; and a high risk of birth defects if a woman ingests

the drug while pregnant." Ibid. There is also evidence that

Accutane, originally studied for use in treating cancer, has an

effect on the gastrointestinal tract, McCarrell I, supra, slip op.

at 6, 23-26, as acknowledged in the Accutane patent applications,

Rossitto, supra, slip op. at 8. Pre-approval studies using dogs

also "revealed instances of dose-related gastrointestinal

bleeding." Id. at 6. Similarly, in defendants' Accutane clinical

study of 523 patients, 21.6% suffered gastrointestinal side

effects – primarily effects on mucous membranes – including such

minor effects as increased thirst and appetite, nausea, and

 8 A-4760-14T1
anorexia, as well as more serious gastrointestinal bleeding. Ibid.

Gastrointestinal symptoms were also reported in 34% of the clinical

trial patients who took a chemically-similar drug (Vesanoid, the

brand name for tretinoin), manufactured by defendants to treat

leukemia. Ibid.

 These Accutane cases concern the alleged propensity of the

drug to cause IBD, a chronic disease that primarily manifests as

one of two diseases: Crohn's disease or ulcerative colitis. Kendall

I, supra, 209 N.J. at 181.4 Ulcerative colitis – plaintiffs'

diagnosed condition – primarily involves inflammation of the

lining of the colon (large intestine), while Crohn's disease can

occur in any part of the digestive tract from the mouth to the

anus, although it primarily manifests in the small intestine (the

ileum) and the colon. Rossitto, supra, slip op. at 7. Both IBD

forms share the same core symptoms: abdominal pain, frequent and

often bloody bowel movements, and rectal bleeding. Kendall I,

supra, 209 N.J. at 181.

 IBD's cause remains largely unknown; several triggers,

however, are associated with a statistically increased rate of

IBD, including family history, infections, some antibiotics,

4
 We note that an appeal is pending in In re Accutane Litigation,
A-4698-14, from the trial judge's May 8, 2016 order that dismissed
MCL cases in which the plaintiffs alleged they developed Crohn's
disease as a result of taking Accutane.

 9 A-4760-14T1
smoking, and possibly the use of oral contraceptives and

nonsteroidal anti-inflammatory drugs. Ibid. IBD's peak onset

occurs during adolescence, the same period individuals are likely

to take Accutane. Ibid.

 (3)

 Defendants "designed, manufactured, and labeled Accutane in

New Jersey and distributed the product from this State." McCarrell

II, supra, 227 N.J. at 577. The FDA did not require a warning

about IBD on the 1982 Accutane launch label, even though

defendants, "as the sponsoring pharmaceutical company, had

included information in its NDA indicating that the drug had an

effect on the gastrointestinal tract." Rossitto, supra, slip op.

at 8. Upon obtaining FDA approval, defendants began receiving

reports of IBD in Accutane patients. Id. at 9. Defendants amended

the "Adverse Reactions" section of the label in August 1983 to

provide that "IBD and mild gastrointestinal bleeding had been

reported in 'less than 1% of patients and may bear no relationship

to therapy.'" Ibid.

 By letter dated September 8, 1983, Public Citizen, a nonprofit

consumer advocacy group, "petitioned the FDA for enhanced warnings

on Accutane about a variety of serious adverse reactions, including

IBD." Ibid. "Public Citizen expressed concern that the 'potential

 10 A-4760-14T1
toxicity' of Accutane had been 'seriously under-emphasized'

because the drug had been approved on limited data, had received

'fast track' approval, and had been overprescribed by physicians."

Id. at 9-10. Public Citizen cited reports of patients developing

IBD, noting that because of underreporting the reported cases

underestimated IBD's actual occurrence, and recommended

defendants' inclusion of a warning about the risk of developing

the disease. Id. at 10.

 Defendants amended the "Warnings" section of the Accutane

package insert provided to physicians in March 19845; that warning

remained in effect until 2000. It provided that "Accutane has been

temporally associated with [IBD] in patients without a prior

history of intestinal disorders" and that patients "experiencing

abdominal pain, rectal bleeding or severe diarrhea should

discontinue Accutane immediately." Ibid. At that same time,

defendants issued a "Dear Doctor" letter to prescribing

physicians, which explained that ten Accutane patients:

 have experienced gastrointestinal disorders
 characteristic of inflammatory bowel disease
 (including 4 ileitis and 6 colitis). While
 these disorders have been temporally
 associated with Accutane administration,
 i.e., they occurred while patients were taking
 the drug, a precise cause and effect

5
 The insert contained a "black box" warning about the risk of
birth defects and of developing pseudotumor cerebri (intercranial
hypertension), but not IBD.

 11 A-4760-14T1
 relationship has not been shown. [Defendants
 are] . . . continuing to monitor adverse
 experiences in an effort to determine the
 relationship between Accutane . . . and these
 disorders.

 [McCarrell I, supra, slip op. at 7.]

 As compelled by law, 21 C.F.R. §§ 314.80-81 (2017), defendants

continued to: monitor the safety of Accutane; report to the FDA

any adverse drug experiences and any new information that might

affect the "safety, effectiveness or labeling of the drug product";

review the scientific literature; and review the data for evidence

of signals, that is, "potential safety issues that should be

included on the product label." Rossitto, supra, slip op. at 13.6

"From 1992 to 1998, defendants recorded several positive

rechallenge reports of IBD." Id. at 14. Dr. Alan Bess, defendants'

former Director of Drug Safety, admitted that a single positive

rechallenge could be significant enough to warrant inclusion of

the event on the label. Ibid. Dr. Martin Huber, another former

Director of Drug Safety, however, "stated it was 'very difficult

to interpret' positive rechallenge data for IBD, because it is a

6
 "As part of that monitoring process, defendants collected data
on adverse drug experiences . . . or events through its call center
and through MedWatch, the FDA's voluntary reporting system." Ibid.
As required by 21 C.F.R. §314.80(f) (2017), defendants "recorded
the reports on an FDA form, listing among other information, a
description of the event and whether it abated after the patient
stopped using Accutane and returned after reintroduction (referred
to as 'challenge'/'dechallenge'/'rechallenge')." Id. at 13-14.

 12 A-4760-14T1
permanent disease in which the symptoms wax and wane." Ibid.

 Defendants also inputted data from reports of adverse drug

experiences (ADE) into their internal ADVENT database, which

contained a field reflecting defendants' assessment of

relatedness. Id. at 15. Defendants prepared periodic internal

causality reports, which were not required to be submitted to the

FDA, that evaluated the ADE reports. Ibid. In one internal

causality assessment, defendants set forth that from 1982 to 1994,

104 cases of IBD and related syndromes were reported in Accutane

users, "of which thirty-three were given a causality rating of

'possibly or probably related to the administration of the drug.'"

Ibid. Based on that information, Dr. Henry Lefrancq, a Roche

physician, stated in a February 24, 1994 internal memo – which was

not submitted to the FDA – that "[i]t is reasonable to conclude

from this data, that in rare cases, ROACCUTANE[7] may induce or

aggravate a preexisting colitis." Id. at 16. He explained "it was

reasonable to assume Accutane has the same effect on the intestinal

mucosa as on the other mucosae in the body such as the oral or

nasal mucosae" and that "these reactions have always been

reversible, the colitis which may develop in a relatively limited

7
 Roaccutane, also spelled Roaccutan, is Accutane's European brand
name.

 13 A-4760-14T1
number of patients can as well be regarded as reversible." In

their June 1994 "general data" report, defendants stated that

"[c]olitis appears as a possible Side [E]ffect of ROACCUTANE" and

that inflammation of the small intestine and colon "is a possible

side effect of ROACCUTANE in very rare cases, possibly in patients

predisposed to inflammatory gastro-intestinal diseases."

 Meanwhile, defendants prepared periodic safety update reports

(PSUR) for the European market. In an August 17, 1988 report, Dr.

Peter Schifferdecker, a physician and product specialist, reviewed

the ADE reports received from patients using Accutane from January

1 to June 30, 1988, and reported that "[s]ince introduction,

R[oche] Drug Safety received [thirty-eight] case reports of

colitis and proctitis[8] in association with [Accutane] treatment."

Kendall I, supra, slip op. at 10. Schifferdecker wrote that:

 [u]lcerative colitis and proctitis has an
 incidence rate of approximately 6-8 cases per
 100,000 population per year (U.S.A. and
 western Europe). . . .

 It appears that cases of colitis and proctitis
 reported to R[oche] Drug Safety are within the
 spontaneous incidence rates of the background
 population, although underreporting of such
 cases may occur. It should be stressed that
 approximately one half of the patients were
 at a certain risk for the development of
 colitis prior to [Accutane] treatment.

8
 Proctitis is an inflammation of the lining of the rectum.

 14 A-4760-14T1
 Although there is evidence from in vitro and
 animal experiments that [Accutane] may protect
 the organism from experimental colitis,[9] []
 R[oche] Drug Safety will further monitor
 closely cases of colitis and proctitis
 reported in association with [Accutane]
 treatment.

 [Id. at 10-11.]

In a November 16, 2000 PSUR, which they also did not submit to the

FDA, defendants reviewed ADEs from September 1, 1999, to August

31, 2000, and concluded that "[i]sotretinoin has been found to be

causally associated with [IBD], including colitis."

 (4)

 In December 1997, as sales of Accutane were "escalating

sharply," there arose differences of opinion between defendants'

drug safety department and defendants' marketing department about

adopting a label change to warn about a different side effect

(depression) of Accutane. Rossitto, supra, slip op. at 17. Bess

testified that Frank Condella, defendants' vice-president of

marketing, "felt very strongly that any label change would hurt

U.S. sales." Ibid. "The marketing department's 'philosophy was to

protect the franchise' and 'build the product,' and thus Condella,

during a 'very loud disagreement,' 'made it very clear that he

9
 Scientists have attempted to produce colitis in laboratory
animals through vascular impairment and immunological methods.

 15 A-4760-14T1
wouldn't tolerate any action that would hurt the product.'" Ibid.

"Mike Carter, [a drug safety officer] who reported to Bess, agreed

that '[m]arketing was calling the shots.'" Id. at 17-18.

 Russell Ellison, defendants' former chief medical officer,

who testified in Rossitto, Gaghan, and Kendall II, admitted

defendants "made a significant investment in marketing Accutane,

and that its investment strategy was to '[f]eed the goose that

lays the golden egg.'" Rossitto, supra, slip op. at 18. Ellison

acknowledged there were "disagreements" between marketing and drug

safety, and that safety-related label changes can hurt sales, but

he disputed that marketing "called the shots" and claimed that

marketing concerns "did not prevail because in February 1998 the

Accutane label was changed to include a stronger warning about

depression." Ibid.

 In any event, in March 1998, the FDA warned defendants that

their advertising and promotional materials for Accutane

 were "false or misleading" and promoted
 "Accutane for an unapproved use." The FDA
 found that Roche had failed to disclose "that
 depression may be associated with the use of
 Accutane," and had "misleadingly" suggested
 "that Accutane therapy will minimize or
 improve the patient's psychosocial status,
 including depression," even though Roche had
 "not systematically studied" the ability of
 Accutane to modify or prevent depression.
 According to the FDA, Roche's claim was
 "particularly troublesome in light of
 information recently presented in a Dear

 16 A-4760-14T1
 Doctor letter, that Accutane may cause
 depression[.]" The FDA required Roche to cease
 this promotional activity and to instruct its
 sales personnel to stop disseminating the
 materials.

 [Id. at 18-19.]

 As our record reflects, in February 1999, the FDA asked

defendants whether they had "enough data to observe" Accutane-

associated IBD "reversibility." This inquiry generated some

internal "confusion" because defendants understood IBD was a

permanent, irreversible condition. In considering defendants'

response, Carter observed that the Accutane label "says nothing"

about reversibility "particularly, therefore one would assume . .

. [FDA may feel wrongly] the event is reversible." In a series of

internal emails captioned "urgent," Huber sought help on the

"reversibility" issue.

 In January 2000 – eleven months later – while then engaged

in negotiations with the FDA regarding finalizing a new Accutane

label – defendants responded to the FDA's inquiry by relying on a

report by Dr. John LaFlore, a Roche physician, and by proposing

no changes to the IBD label. In his October 1999 report, LaFlore

had stated that, from 1992 to 1999, there had been 206 "case

reports" "with IBD as a preferred term," but claimed there had

been only one "positive rechallenge," explaining:

 17 A-4760-14T1
 [t]he onset of these events during
 isotretinoin use and the positive dechallenge
 reports are sufficient to justify the current
 warning in the label that IBD and regional
 ileitis may temporally arise during therapy
 and anyone with appropriate symptoms should
 discontinue therapy. However, the reports do
 not have the quality to revise this warning.

He concluded there was insufficient information

 to recommend additional label changes related
 to [IBD]. Some patients with known active
 symptoms and diagnosis of . . . (IBD) are
 treated with Accutane for their severe
 recalcitrant acne without clinical sequel to
 their IBD symptoms. . . . There is no
 additional information to suggest an
 association of isotretinoin use with
 recurrence or prolongation of the symptoms of
 the disease based on the etiology and
 epidemiology of the disease.

 Nonetheless, in May 2000, the FDA approved an amendment to

the "WARNINGS" section of the package insert or label – warnings

at issue in this appeal. These amendments, which were provided to

physicians but not patients, removed the word "temporally," and

this time warned that:

 Accutane has been associated with inflammatory
 bowel disease (including regional iletis) in
 patients without a prior history of intestinal
 disorders. In some instances, symptoms have
 been reported to persist after Accutane
 treatment has been stopped. Patients
 experiencing abdominal pain, rectal bleeding
 or severe diarrhea should discontinue Accutane
 immediately (see ADVERSE REACTIONS:
 Gastrointestinal).

The "ADVERSE REACTIONS" section asserted that the "relationship

 18 A-4760-14T1
of some" of the listed events "to Accutane therapy"

 is unknown. Many of the side effects and
 adverse reactions seen in patients receiving
 Accutane are similar to those described in
 patients taking very high doses of vitamin A
 (dryness of the skin and mucous membranes,
 e.g. of the lips, nasal passage, and eyes).

 . . . .

 Gastrointestinal inflammatory bowel disease
 (see WARNINGS: inflammatory bowel disease)
 . . . bleeding and inflammation of the gums,
 colitis, ileitis, nausea, and other
 nonspecific gastrointestinal symptoms.

Bess admitted that "[t]he term 'association' is susceptible of

different meanings within a package insert or label." Eileen Leach,

defendants' former Medical Director of Dermatology, testified that

"associated" does not mean "cause," and that if defendants had

concluded that Accutane caused IBD, it should have included that

finding on the label. Huber agreed there was a difference between

"association" and "causation." Huber similarly admitted it would

be inappropriate to state that a drug is "associated with" an

adverse event (such as birth defects) if defendants knew there was

a causal relationship. And he recognized that, if defendants

believed that an event was caused by a drug, they "had an

obligation to include that in [the] label."

 (5)

 Beginning in January 2002, defendants implemented a new

 19 A-4760-14T1
pregnancy prevention program entitled "System to Manage Accutane

Related Tetatogenicity," or "S.M.A.R.T." Under that program, a

physician could only prescribe Accutane after obtaining a supply

of yellow Accutane stickers. To receive the stickers the physician

had to "[r]ead" the S.M.A.R.T. Guide to Best Practices, and "[s]ign

and return" a letter of understanding that stated:

  I know the risk and severity of fetal
 injury/birth defects from Accutane.

  I know how to diagnose and treat the
 various presentations of acne.

  I know the risk factors for unplanned
 pregnancy and the effective measures for
 avoidance of an unplanned pregnancy.

  . . . I will refer [the patient] for
 expert, detailed pregnancy prevention
 counseling and prescribing, reimbursed
 by the manufacturer, OR I have the
 expertise to perform this function and
 elect to do so.

  I understand and will properly use
 throughout the Accutane treatment
 course, the S.M.A.R.T. procedures for
 Accutane including monthly pregnancy
 avoidance counseling, pregnancy testing
 and use of the yellow self-adhesive
 Accutane Qualification stickers.

This S.M.A.R.T. Guide to Best Practices provided to physicians,

however, focused almost exclusively on birth control and pregnancy

and only briefly warned about IBD in a section entitled "About

Accutane," prefaced with a statement that "Accutane is teratogenic

 20 A-4760-14T1
and must not be used by pregnant women," following which it

acknowledged that

 Accutane use is associated with other
 potentially serious adverse effects, as well
 as more frequent, but less serious side
 effects. More frequent, less serious side
 effects include cheilitis, dry skin, skin
 fragility, pruritus, epistaxis, dry nose and
 dry mouth and conjunctivitis.

 Adverse Event Warnings include psychiatric
 disorders . . . ; pseudotumor cerebri;
 pancreatitis; hyperlipidemia; hearing
 impairment; hepatotoxicity; inflammatory
 bowel disease; skeletal changes . . . ; [and]
 visual impairment.

These paragraphs were followed by a statement that "[p]atients

should be reminded to read the Medication Guide, distributed by

the pharmacist at the time Accutane is dispensed." Pharmacists

gave the "Medication Guide," published in January 2001, directly

to patients. In alerting of the "possible serious side effects"

of Accutane, the Guide described some of the symptoms of IBD but

did not refer to the disease by name:

 Abdomen (stomach area) problems. Certain
 symptoms may mean that your internal organs
 are being damaged. These organs include the
 liver, pancreas, bowel (intestines), and
 esophagus . . . . If your organs are damaged,
 they may not get better even after you stop
 taking Accutane. Stop taking Accutane and
 call your prescriber if you get severe
 stomach, chest or bowel pain; have trouble
 swallowing or painful swallowing; get new or
 worsening heartburn, diarrhea, rectal

 21 A-4760-14T1
 bleeding, yellowing of your skin or eyes, or
 dark urine.

 . . . .

 Serious permanent problems do not happen
 often. However, because the symptoms listed
 above may be signs of serious problems, if you
 get these symptoms, stop taking Accutane and
 call your prescriber. If not treated, they
 could lead to serious health problems. Even
 if these problems are treated, they may not
 clear up even after you stop taking Accutane.

 Beginning in January 2002, physicians were also required to

provide patients with a patient brochure: a bright pink-colored,

metal-ring binder entitled "Be Smart/Be Safe/Be Sure." Kendall I,

supra, 209 N.J. at 183. As with the other materials referred to

above, the "binder materials primarily focused on the dangers of

becoming pregnant while taking Accutane." Ibid. The first section

of the Eighth and Ninth Edition warned of "serious side effects,"

without specifically referring to IBD. These editions also

included consent forms to be removed and signed by the patients,

one of which stated that the patient had read and understood the

provided written materials, and listed several side effects of

Accutane, including birth defects and the risk of depression and

suicide, but not IBD.10

10
 Female patients also were required to sign a second "patient
information/consent" form, which stated that the patient had read
and understood the written material and had watched a video on
contraception.

 22 A-4760-14T1
 Similar warnings to patients were included on the blister

packaging, which again primarily warned about birth defects and

depression, but also warned of "other serious side effects to

watch for," without specifically referring to IBD:

 Stop taking Accutane and call your prescriber
 if you develop any of the problems on this
 list or any other unusual or severe problems.
 If not treated they could lead to serious
 health problems. Serious permanent problems
 do not happen often.

 . . . .

 Severe stomach pain, diarrhea, rectal
 bleeding, or trouble swallowing . . . .

 In September 1999, the American Journal of Gastroenterology

published a letter to the editor in which the mother of an Accutane

patient raised concerns about the latent onset of IBD. The writer

suggested defendants, who had not conducted any post-marketing

clinical or epidemiological studies to investigate a link between

Accutane and IBD, should conduct such a study. Defendants

internally expressed concern that they should look at this issue

"with some dispatch," and that "a letter in a fairly widely-read

journal . . . might add fuel to fires which are already set."

 Ten years later (after trials in the first two Accutane cases,

McCarrell I and Kendall I), the first Accutane observational

 23 A-4760-14T1
epidemiological studies11 were conducted by researchers, not

defendants; these studies yielded mixed results. Only one study

found a statistically-significant positive association between

Accutane and ulcerative colitis, although four studies found a

positive association between the drug and ulcerative colitis (but

not Crohn's disease).

 (6)

 Cheryl Blume, a pharmacologist and vice-president of a

pharmaceutical consulting company, testified as plaintiffs' expert

in regulatory affairs, pharmacovigilance, and drug labeling in all

11
 There are two types of epidemiological studies: experimental
and observational. Reference Manual on Sci. Evidence 549, 555 (3d
ed. 2011), which may be found at the following location:
http://www.supremecourt.ohio.gov/LegalResources/LawLibrary/resou
rces/scientificEvidence.pdf. Experimental studies, or double-
blind randomized control trials, in which one group is exposed to
an agent and the other is not, are "considered the gold standard
for determining the relationship of an agent to a health outcome
or adverse side effect." Ibid. There are no Accutane experimental
studies because even though such studies have the potential to
provide higher quality evidence, they cannot ethically be
conducted if researchers suspect that a drug's side effects are
harmful. Id. at 555-56. Instead, all Accutane epidemiological
studies to date have been less rigorous observational studies.
Unlike experimental studies in which risk factors can be
controlled, observational studies generally focus on individuals
living in a community, "for whom characteristics other than the
one of interest, such as diet, exercise, exposure to other
environmental agents, and genetic background, may distort a
study's results." Id. at 556. "[T]he Achilles' heel of
observational studies is the possibility of differences in the two
populations being studied with regard to risk factors other than
exposure to the agent." Ibid.

 24 A-4760-14T1
of the Accutane cases tried to date. Rossitto, supra, slip op. at

26. She opined that neither the 1984 warning, McCarrell I, supra,

slip op. at 108, Sager, supra, slip op. at 21-22; Rossitto, supra,

slip op. at 26, nor the amended 2000-warning, Kendall I, supra,

slip op. at 31-32, accurately reflected defendants' knowledge

concerning IBD.

 In opposing defendants' summary judgment motion, plaintiffs

cited to Blume's testimony at the Tanna trial; there, she opined

the post-2000 warnings were inadequate because defendants failed

to disclose all information they possessed at that time:

information they had disclosed for other adverse events, including

birth defects and psychiatric disorders. She explained the package

insert was the "hub of all the information, and everything else

comes out of it" like spokes on a wheel. In her view, as a general

matter, the warning section of a label contains "the more serious

adverse events that have been observed with a product."

 Blume testified that although defendants listed IBD in the

warnings section of the label, they failed to advise physicians

they had internally concluded Accutane was "causally associated"

with IBD, that several cases of IBD had been found to be "possibly"

or "probably" related to Accutane, and that Accutane can "induce

or aggravate a preexisting colitis." She testified that defendants

also failed to warn that IBD is a permanent, irreversible condition

 25 A-4760-14T1
that cannot be treated, that there were several reported cases of

rechallenges, that there is a latent onset effect, and that the

drug was contraindicated for patients with a family history or

pre-existing IBD. And she asserted that Schifferdecker erroneously

reported in 1988 that adverse events of IBD were "within the

spontaneous incidence rates" because he failed to account for

underreporting.

 Blume explained the difference between the term "associated,"

which "simply means that the event occurred in some time proximity

to when the drug was taken," and "causally associated," meaning

"there's information linking the drug use with the adverse event."

She additionally testified that defendants, in warning about other

adverse events, had included: causal language (birth defects and

psychiatric disorders); a warning that the adverse event had been

found to be "possibly or probably related to Accutane"

(hepatotoxicity); and a warning that the event had subsided with

discontinuation of therapy and recurred with reinstitution of

therapy (psychiatric disorders). Consequently, she testified

defendants should similarly have included more information about

IBD, as they had for another rare disease (pseudotumor cerebri),

because the prescribing physicians were generally dermatologists

who may not have been familiar with the permanence and severity

of this gastrointestinal disease.

 26 A-4760-14T1
 Blume concluded that the amended 2000 label had not been

effective in warning physicians about IBD's severity and

permanence because defendants continued to receive reports of

rechallenges; that is, physicians continued to prescribe Accutane

even after patients developed gastrointestinal side effects. And

she opined that the other warning materials, including the

Medication Guide and the S.M.A.R.T. binders, did not make

sufficiently clear that IBD was a permanent disease that cannot

be cured with treatment. In fact, Blume found the risk of IBD was

minimized in both the Medication Guide and the S.M.A.R.T. binders

because the symptoms of the disease were grouped with other non-

relevant gastrointestinal problems such as painful swallowing and

dark urine.

 B

 Despite this evidence, the trial judge granted defendants'

motion for summary judgment, finding the post-2002 warnings

contained in the written literature were adequate as a matter of

law to alert prescribing physicians that IBD was a risk associated

with the ingestion of Accutane. In revisiting these issues, which

Judge Higbee had already considered and rejected, the judge alluded

to "new controlling authority," namely, Bailey v. Wyeth, Inc., 424

N.J. Super. 278, 314 (Law Div. 2008), aff'd, 422 N.J. Super. 360

 27 A-4760-14T1
(App. Div. 2011), certif. denied, 211 N.J. 274 (2012), and

concluded plaintiffs failed to present "the type and quality of

evidence" required to "overcome the rebuttable presumption of

adequacy under the NJPLA afforded to the FDA-approved labeling

utilized by these [d]efendants in the marketing of Accutane."

Citing to the written warnings, and not to the testimony of Leach,

Bess, Huber or Blume, or defendants' internal documents, the judge

concluded that:

 Both the substance and form of the warning
 literature issued to prescribing physicians by
 [d]efendants emanates a very forceful
 seriousness of purpose; driving home the
 message to physicians of ordinary skill, care
 and diligence that is clear, accurate and
 unambiguous, namely, You are about to
 prescribe a medication that is associated with
 risk of serious side effects. You are
 responsible for counseling your patients of
 these risks.

 Taken as a whole, the warning system crafted
 by [d]efendants conveys a meaning as to
 potential risks and consequences that is
 unmistakable. It is inconceivable to this
 court that the reasonable dermatologist (or
 any physician, generally) of ordinary
 education, training and experience could
 examine the materials comprising the warning
 literature and not immediately conclude that
 Accutane has been associated with life-
 altering side effects, including IBD. At
 multiple points, IBD is explicitly communi-
 cated to the prescribing physician as a
 potential risk of Accutane ingestion.

 [T]he labeling and all the warning literature
 issued to physicians by the manufacturer very

 28 A-4760-14T1
 ably disclose with ample detail and intensity
 the risks associated with taking Accutane.
 Viewed objectively, it is a striking package
 of information for introducing a medication
 to a prescribing physician. Any physician of
 ordinary skill, care and diligence who ignored
 the [d]efendants' warning system did []
 patients a disservice. Such warnings are
 entitled to the benefit of our state's
 rebuttable presumption of adequacy and are
 deemed adequate as a matter of law.

In our de novo review of this determination, we start with certain

general principles.

 C

 As a general matter, the adequacy of a warning presents a

jury question. Kendall I, supra, 209 N.J. at 195. At the same

time, we recognize that when a plaintiff fails to overcome the

PLA's rebuttable presumption of adequacy in pharmaceutical cases,

Bailey, supra, 424 N.J. Super. at 314, or where a warning is

accurate, clear and unambiguous, Banner v. Hoffmann-La Roche Inc.,

383 N.J. Super. 364, 378-80 (App. Div. 2006), certif. denied, 190

N.J. 393 (2007), a court may conclude that warnings are adequate

as a matter of law.

 We also observe that the PLA was enacted "as a remedial

measure to limit the liability of manufacturers by establishing

'clear rules with respect to certain matters relating to actions

for damages for harm caused by products,'" and "[i]n particular,"

 29 A-4760-14T1
to "reduce the burden on manufacturers of FDA-approved products

resulting from products liability litigation." Kendall I, supra,

209 N.J. at 194 (quoting N.J.S.A. 2A:58C-1(a)). In accordance with

common law principles, Feldman v. Lederle Labs., 125 N.J. 117, 144

(1991), cert. denied, 505 U.S. 1219, 112 S. Ct. 3027, 120 L. Ed.

2d 898 (1992), the PLA provides that a manufacturer shall be

rendered liable for harm caused by a product "not reasonably fit,

suitable or safe for its intended purpose" when the product

"fail[s] to contain adequate warnings." N.J.S.A. 2A:58C-2. The PLA

represents "an expression of New Jersey's strong public policy of

ensuring that manufacturers attach adequate warnings and

instructions to prescription drugs so that consumers, ultimately,

will be made aware of the relevant risks, dangers, and precautions

in taking such medications." In re Reglan Litig., 226 N.J. 315,

335 (2016).

 In addition, we take note that the Supreme Court of the United

States has "articulated an overarching federal policy for

permitting state-law [failure-to-warn] suits," id. at 334, by

recognizing that the FDA:

 has limited resources to monitor the 11,000
 drugs on the market, and manufacturers have
 superior access to information about their
 drugs, especially in the postmarketing phase
 as new risks emerge. State tort suits uncover
 unknown drug hazards and provide incentives
 for drug manufacturers to disclose safety

 30 A-4760-14T1
 risks promptly. They also serve a distinct
 compensatory function that may motivate
 injured persons to come forward with
 information. Failure-to-warn actions, in
 particular, lend force to the [Federal Food,
 Drug, and Cosmetic Act's] premise that
 manufacturers, not the FDA, bear primary
 responsibility for their drug labeling at all
 times.

 [Wyeth v. Levine, 555 U.S. 555, 578-79, 129
 S. Ct. 1187, 1202, 173 L. Ed. 2d 51, 68-69
 (2009).]

 Of additional importance, the PLA incorporates the "learned

intermediary" doctrine by which a manufacturer's duty to warn

about the dangers of prescription drugs runs to the physician, not

the patient. N.J.S.A. 2A:58C-4; Perez v. Wyeth Labs., Inc., 161

N.J. 1, 10 (1999); Niemiera by Niemiera v. Schneider, 114 N.J.

550, 559 (1989). Significantly, the PLA recognizes "the important

role of the federal regulatory system over prescription drugs,"

Reglan Litig., supra, 226 N.J. at 335, and provides that an FDA-

approved drug warning constitutes "a rebuttable presumption" that

the warning is adequate, N.J.S.A. 2A:58C-4. In other words, "an

FDA-approved label is presumably adequate to inform a reasonable

person of the dangers of a product." Kendall I, supra, 209 N.J.

at 197. The Court also expressed an expectation that the

presumption would be overcome only in "rare cases." Perez, supra,

161 N.J. at 25.

 We also recognize that, in accordance with the Federal Food,

 31 A-4760-14T1
Drug, and Cosmetic Act (FDCA), 21 U.S.C.A. §§ 301-399f, all

pharmaceutical drugs must be FDA-approved before being marketed

in the United States. Reglan Litig., supra, 226 N.J. at 329. The

FDA, which regulates the manufacturing, packaging, and labeling

of drugs under the FDCA, approved all of the warnings at issue

here, including: the May 2000 package insert; the January 2001

Medication Guide; the January 2002 S.M.A.R.T. Guide to Best

Practices; the January 2002 "Be Smart/Be Safe/Be Sure" patient

brochure; and the blister packaging. See 21 U.S.C.A. § 355(a).

 The FDCA requires a pharmaceutical manufacturer to prove,

prior to marketing, that a new drug "is safe and effective and

that the proposed label is accurate and adequate." PLIVA, Inc. v.

Mensing, 564 U.S. 604, 612, 131 S. Ct. 2567, 2574, 180 L. Ed. 2d

580, 588 (2011). These federal statutes and regulations are based

on the central premise that "the manufacturer bears responsibility

for the content of its label at all times [and] is charged both

with crafting an adequate label and with ensuring that its warnings

remain adequate as long as the drug is on the market." Wyeth,

supra, 555 U.S. at 570-71, 129 S. Ct. at 1197-98, 173 L. Ed. 2d

at 63. The FDCA renders a manufacturer responsible for "the

accuracy and adequacy" of a label "not only when it files a new

drug application, but also when it seeks FDA approval for updated

labeling to inform the public of previously unknown adverse side

 32 A-4760-14T1
effects caused by a drug, 21 U.S.C.A. §§ 355(b)(1),(d),(j)(2)(A)."

Reglan Litig., supra, 226 N.J. at 330 (quoting Mensing, supra, 564

U.S. at 612, 131 S. Ct. at 2574, 180 L. Ed. 2d at 588).

 In failure-to-warn claims involving pharmaceutical drugs, our

Legislature has acknowledged "the preeminent role of federal

regulation," Cornett v. Johnson & Johnson, 211 N.J. 362, 387

(2012), by affording manufacturers a "rebuttable presumption" that

FDA-approved warnings will be assumed "adequate." N.J.S.A. 2A:58C-

4. This presumption helps "to ensure that manufacturers are not

made guarantors against remotely possible, but not scientifically-

verifiable, side-effects of prescription drugs, a result that

could have 'a significant anti-utilitarian effect.'" Perez, supra,

161 N.J. at 25.

 D

 Notwithstanding, the PLA recognizes that compliance with FDA

regulations provides only "compelling" – "not absolute" – evidence

that "a manufacturer satisfied its duty to warn about the dangers

of its product." Kendall I, supra, 209 N.J. at 195; Perez, supra,

161 N.J. at 24. It was anticipated that this "virtually

dispositive" presumption would be difficult to overcome. Kendall

I, supra, 209 N.J. at 195-97; see Dreier, Keefe & Katz, Current

N.J. Products Liability & Toxic Torts Law 468-69 (2017). Yet the

 33 A-4760-14T1
parties acknowledge the statutory presumption can be overcome.

They disagree, however, as to the precise effect and force of the

presumption. Plaintiffs argue that, "on its face, the statute does

not appear to require anything more than that necessary to overcome

a standard N.J.R.E. 301 presumption." We reject this view.

 N.J.R.E. 301 provides that "[i]f evidence is introduced

tending to disprove the presumed fact, the issue shall be submitted

to the trier of fact for determination unless the evidence is such

that reasonable persons would not differ as to the existence or

nonexistence of the presumed fact." Latching on to this approach,

plaintiff argues the PLA created, in their words, only "a garden

variety rebuttable presumption" that should be viewed in the manner

prescribed by N.J.R.E. 301. But, when considering the PLA's intent

to limit the liability of drug manufacturers, it seems clear the

garden-variety presumption of N.J.R.E. 301 was discarded in favor

of what Perez described as something that "[f]or all practical

purposes," will not be overcome "absent deliberate concealment or

nondisclosure of after-acquired knowledge of harmful effects,

compliance with FDA standards should be virtually dispositive of

[failure-to-warn claims]." 161 N.J. at 25.

 The Court confirmed that interpretation in Rowe v. Hoffman-

La Roche, Inc., 189 N.J. 615, 626 (2007). And, in Kendall I, supra,

209 N.J. at 195, the Court referred to its holding in Perez as

 34 A-4760-14T1
having created "a super-presumption." Consequently, we reject

plaintiff's argument that the statutory presumption should be

approached in the manner described in N.J.R.E. 301. We recognized

as much when we affirmed the trial court's explanation in Bailey,

supra, 424 N.J. Super. at 314, that "the presumption of adequacy

afforded to a manufacturer's compliance with FDA requirements is

stronger and of greater evidentiary weight than the customary

presumption referenced in N.J.R.E. 301." See also Dreier, Keefe &

Katz, supra, at 468-69 (observing that the statutory presumption

described in Perez is much stronger than the typical presumption).

 Consequently, this view of the presumption poses a question

relevant to this appeal: what type and degree of proof will rebut

the N.J.S.A. 2A:58C-4 "super presumption?" In Kendall I, supra,

slip op. at 53, we said the "strength of the statutory presumption

may be lessened . . . if the warning at issue is not the initial

warning approved by the FDA for the drug," as in these cases, "but

rather is a modified warning that was negotiated post-market

between the manufacturer and the FDA." And we recognized in McDarby

v. Merck & Co., 401 N.J. Super. 10, 65 (App. Div. 2008), appeal

dismissed, 200 N.J. 267 (2009), that, prior to 2007, the FDA did

not have the "authority to compel labeling changes, but instead

had to negotiate changes with the drug's sponsor." And, given the

manufacturers' "common resistance to such labeling changes, a

 35 A-4760-14T1
revised label may be the result of a compromise, rather than a

unilateral expression of the FDA's preferred regulatory approach."

Kendall I, supra, slip op. at 54. In light of the ongoing

regulatory dynamics between drug companies and the FDA, the PLA's

presumption of adequacy is easier to overcome for a negotiated,

post-market label than for the original warning accompanying the

drug, which was not, to the same extent, the result of

"conciliatory processes." McDarby, supra, 401 N.J. Super. at 69.

See Wyeth, supra, 555 U.S. at 578-79, 129 S. Ct. at 1202, 173 L.

Ed. 2d at 68 (recognizing FDA's "limited" monitoring resources).

 The presumption may also be overcome with: (1) evidence of a

deliberate concealment or nondisclosure of after-acquired

knowledge of harmful effects, Perez, supra, 161 N.J. at 25; Rowe,

supra, 189 N.J. at 626; or (2) substantial evidence of

economically-driven manipulation of the post-market regulatory

process, McDarby, supra, 401 N.J. Super. at 63, 66.

 As to this first aspect, we note that the Court in Cornett,

supra, 211 N.J. at 390, upheld our reversal of a dismissal on the

grounds of federal preemption, because:

 defendants withheld information from the
 general public and the medical community about
 the limitations of the device or safe use of
 the device, including information that
 instructions for post-implantation therapy
 were not part of the [premarket approval
 (PMA)] process, and misrepresented to the

 36 A-4760-14T1
 general public and medical community that the
 [device] was non-thrombogenic. As stated, this
 claim overcomes the PLA rebuttable presumption
 of adequacy. Perez, supra, 161 N.J. at 25.
 Such a claim falls within a traditional area
 of state concern and regulation because fraud
 on the FDA is not an element of the claim and
 it can be proved by evidence other than by
 evidence of fraud on the FDA.

On the other hand, Bailey presents an example of a plaintiff's

failure to overcome the presumption regarding a revised label.12

Applying the Perez/Rowe exceptions here, we must consider – through

the Brill prism – whether plaintiffs presented sufficient evidence

of deliberate concealment or nondisclosure of after-acquired

knowledge of harmful effects to suggest that a genuine dispute as

to whether the PLA's "super" presumption may be overcome.

 Plaintiffs contend, as in other Accutane cases involving the

1984 warning, that they can overcome the presumption because of

evidence that defendants "failed to disclose information it had

on the risk of IBD with Accutane use, that economics drove its

12
 In Bailey, a trial judge found the plaintiffs failed to overcome
the rebuttable presumption of adequacy afforded FDA-approved
labeling even though the label had been significantly revised on
multiple occasions since initial approval. 424 N.J. Super. at 304,
336. The Bailey trial judge found the plaintiffs "failed to present
any evidence of deliberate concealment or nondisclosure of after-
acquired knowledge" because there was no proof that defendants
withheld any information on safety, including adverse event
reports, prior to approval by the FDA. Id. at 315.

 37 A-4760-14T1
decisions on drug safety and warnings, and that it withheld

information on the risk of the drug from the medical community and

the public." We commence our consideration of the evidential

materials by observing that in all other cases tried to date13

within this MLC matter, juries have found the 1984 FDA-approved

warning that Accutane had been temporally associated with IBD was

inadequate.

 For example, in McCarrell II, supra, 227 N.J. at 577-78, the

plaintiff claimed that

 the Accutane label and other warnings conveyed
 the impression that the listed adverse
 reactions to Accutane would arise while the
 patient was taking the medication and that
 discontinuing its use would resolve such
 problems. Plaintiff also contends that the
 warnings did not suggest that he could develop
 an irreversible case of [IBD] after completion
 of the Accutane regimen. He asserts that,
 during the period he took Accutane, Roche knew
 or should have known that Accutane not only
 could trigger [IBD] after its use, but that
 it also could cause irreversible damage to his
 organs, and that Roche failed to provide
 adequate warnings to him and his physician
 about those risks.

We affirmed those findings in all of the cases raising the issue

of the adequacy of the 1984 warning. In fact, in McCarrell I,

supra, slip op. at 108, we rejected defendants' argument that the

13
 McCarrell I and II, Kendall I and II, Sager, Gaghan, and
Rossitto.

 38 A-4760-14T1
1984 Accutane label warning was adequate as a matter of law under

the PLA. In Kendall I, supra, slip op. at 88-89, we determined

that Blume's testimony was sufficiently persuasive to overcome the

statutory presumption. And, in Rossitto, supra, slip op. at 55-

57, we were satisfied plaintiff presented sufficient evidence to

overcome the presumption, stating:

 As in McCarrell I and Kendall I, here there
 was evidence that the 1984 warning, as it
 existed when plaintiffs took the drug from
 1992 to 1998, was inadequate even though it
 specifically referred to IBD, because it did
 not accurately reflect the knowledge the
 company allegedly had. As we have noted, Dr.
 Blume testified that during the sixteen years
 that the label had remained unchanged (from
 1984 to 2000), Roche had received information
 through ADE reports that indicated both a
 causal relationship between Accutane and IBD
 and a latency effect, which she asserted was
 critically important information for a
 physician to have in making a risk/benefit
 analysis. Dr. Blume also criticized Roche's
 use of the term "temporally associated," which
 was subject to differing definitions by the
 company's own employees, and which she said
 meant while a patient was taking the drug.
 The labeling expert opined that the use of the
 term "temporally" falsely suggested that the
 disease was reversible, and that there was no
 latent effect.

 We recognize that the FDA approved the 1984
 version of the label. Nevertheless, plaintiffs
 marshalled sufficient competing evidence upon
 which a jury reasonably could rely to overcome
 the rebuttable statutory presumption of
 adequacy. At a minimum, viewing the record
 from this trial, as we must, in a light most
 favorable to the respondents . . . there was

 39 A-4760-14T1
 potentially credible proof of the company's
 "deliberate concealment or nondisclosure of
 after-acquired knowledge of [Accutane's]
 harmful effects[.]" Perez, supra, 161 N.J. at
 25 (emphasis added); see also Rowe, supra, 189
 N.J. at 626. On a retrial, the parties are
 free to continue to litigate the general
 causation issues bearing upon Accutane's
 actual "harmful effects" and the adequacy of
 the 1984 label, with the opportunity to expand
 the proofs to include more recent scientific
 studies further addressing those questions.

 We have yet to directly address whether plaintiffs overcame

the presumption of adequacy as to the post-2000 warnings. In

Kendall I, supra, 209 N.J. at 182-84, the Court only considered

the post-2000 warnings as it related to the tolling of the statute

of limitations. In that case, the plaintiff was first prescribed

Accutane in 1997 (when the 1984 warning was in effect), was

diagnosed with IBD in April 1999, received her fifth course of

Accutane in December 2000, and her sixth course from 2003 to 2004

(when the 2000 warnings at issue here were in effect). Id. at 184-

86. The jury considered only the earlier warnings and found

defendants failed to provide an adequate warning to the treating

physician of the risks of IBD from Accutane that it either knew

or should have known prior to April 1999. We reversed and remanded

on other grounds but found Kendall had presented sufficient

evidence, regarding its pre-1999 warnings, to overcome the

presumption:

 40 A-4760-14T1
 There is ample factual proof in the present
 record to justify the jury's determination
 that the warnings supplied with Accutane, even
 though they had been approved by the FDA, were
 inadequate to have reasonably alerted
 plaintiff and her physicians to the risks that
 plaintiff would contract IBD from using the
 drug.

 . . . .

 Among other things, the expert testimony of
 plaintiff's labeling expert, Dr. Blume (who
 was not countered by an equivalent defense
 expert specifically called to opine
 exclusively on labeling issues) was
 sufficiently persuasive and tied to the proofs
 that a reasonable juror could have found the
 statutory presumptions were overcome.

 [Kendall I, supra, slip op. at 88-89.]

 The Supreme Court affirmed, holding that "Kendall's suit may

proceed because the evidence not only overcame the presumption,

but established that under all the circumstances, Kendall

reasonably was unaware that defendants caused her injury until

after December 21, 2003." Kendall I, supra, 209 N.J. at 198. The

Court wrote:

 Although we can conceive of circumstances in
 which the 2003 warning might have been
 sufficient to alert a plaintiff of the
 connection between Accutane and her disease,
 it was certainly not sufficient, in these
 circumstances, to cause Kendall to doubt her
 physicians or to disregard the advice and
 information that had been imparted to her by
 them for the prior six years. That is
 particularly so in light of the lack of a

 41 A-4760-14T1
 discernable link between Kendall's symptoms
 and the ingestion of the drug.

 [Id. at 199.]

The Accutane MCL trial judges have addressed this issue, but with

conflicting results on the adequacy of the post-2000 warnings.

 In considering the adequacy of the post-April 10, 2002

warnings, it may be true that the warnings to physicians (May 2000

package insert and S.M.A.R.T. Guide to Best Practices), and to

patients (2001 Medication Guide, Be Smart/Be Safe/Be Sure binder,

and blister packaging) possess greater clarity than the 1984

warnings at issue in McCarrell I and II, Kendall I and II, Sager,

Gaghan, and Rossitto. "[T]emporally" was removed; without the

connotation conveyed by that word, physicians were warned that

Accutane is "associated" with IBD. Warnings were also added that

IBD symptoms had persisted in some cases after Accutane was

discontinued, thus coming closer to conveying that symptoms may

be permanent. In Rossitto, supra, slip op. at 45, we said "it is

manifestly clear that the 2000 warning . . . strengthen[ed] the

label's warning relating to IBD and gastrointestinal disorders by

removing the 'temporally associated' phrasing."

 But the post-2002 warnings like the 1984 warnings still lack

causal language – what Blume said was "critically important"

information for physicians. Id. at 56. In fact, many of the

 42 A-4760-14T1
treating physicians in the Accutane MCL cases have testified they

would have wanted to know if there was a causal relationship, and

if warned, they would have conveyed that warning to their patients.

Id. at 58-61. The warnings also lack information as to a latency

effect, and lack any statement that the disease is not reversible.

Indeed, the materials provided to patients, which were also

available to physicians, implied that if "treated" a patient would

not suffer "serious health problems." As Judge Higbee found in

denying defendants' previous motion for summary judgment, the

Medication Guide compounded the confusion as to causation by

failing to refer to IBD and by listing the symptoms of IBD along

with other non-relevant symptoms such as yellowing of the eyes and

dark urine.

 The record also contains evidence that defendants had after-

acquired knowledge of these harmful effects that they failed to

disclose. For example, there was evidence that defendants had

internally concluded, based on information contained in ADE

reports, that in some cases there was a causal effect between the

drug and IBD, but defendants did not disclose that information to

the FDA or include it in the Accutane label. And there was evidence

that defendants included that information for other adverse

events, including strong warnings that "there is an extremely high

risk that a deformed infant can result if pregnancy occurs while

 43 A-4760-14T1
taking Accutane," and warnings that Accutane "may cause"

psychiatric disorders."

 The record also contains evidence that defendants received

several positive rechallenge reports, which they did not include

in the label as they had for psychiatric disorders. Consequently,

plaintiffs argue defendants may have misrepresented the number of

rechallenge events in responding to the FDA's inquiry. In addition,

defendants did not respond to the FDA's inquiry regarding whether

Accutane-induced IBD was reversible. Despite this after-acquired

knowledge of harmful effects, and the confusion as to whether the

disease was reversible, no changes to the 1984 label were proposed

by defendants in 2000.

 In applying our familiar standard of review on summary

judgment dispositions, we conclude from this record that

plaintiffs presented sufficient evidence of defendants'

nondisclosure of after-acquired knowledge of Accutane's harmful

effects to overcome the rebuttable statutory presumption of

adequacy and to present a jury question as to the adequacy of the

warning. Although defendants specifically mentioned IBD in their

warnings, there is evidence from which a finder of fact could

conclude that, after FDA-approval, defendants internally concluded

there was a causal effect between Accutane and IBD and received

reports of rechallenges and a latency effect – critical information

 44 A-4760-14T1
that defendants did not disclose in their post-2002 warnings.

 Even though unnecessary to our disposition of this appeal –

because we conclude that plaintiffs overcame the statutory

presumption by presenting sufficient evidence under the first

prong – we briefly discuss the second prong, i.e., whether

plaintiffs presented substantial evidence of economically-driven

manipulation of the post-market regulatory process.

 To give context to this argument we briefly discuss our

experiences with this second prong. In McDarby, supra, 401 N.J.

Super. at 50, the plaintiffs brought claims under the PLA against

a manufacturer of Vioxx for failure to warn of cardiovascular

risks. At the time of FDA approval, the defendant was aware of a

possible, but unconfirmed, risk of increased cardiovascular

events. Id. at 67. Defendant's post-approval study unintentionally

confirmed the increased risk. Ibid. The defendants, however,

sought "to dilute the labeling required as a result of [this]

study" and "to ensure" the results "were not communicated to

prescribing physicians by sales persons." Id. at 68. We concluded

this type of conduct can overcome the presumption, finding that

given the

 admitted flaws in the FDA's control over
 postmarket labeling in the years that Vioxx
 was on the market, we are unwilling to accept
 Merck's position that the presumption of
 adequacy of a prescription drug's label can

 45 A-4760-14T1
 be overcome only upon proof of deliberate
 concealment or nondisclosure. Facts unavail-
 able to the Supreme Court at the time of the
 Perez decision demonstrate that such a
 restriction is too narrow.

 [Id. at 66.]

A similar approach was taken by the trial judge in Bailey, supra,

424 N.J. Super. at 315-19.

 Although the evidence here might not appear as strong as that

in McDarby, we conclude that for present purposes – requiring that

evidence be viewed in plaintiffs' favor – that this evidence also

required a denial of summary judgment.

 In support of their arguments on this second prong of the

Perez/Rowe exception, plaintiffs refer to: (1) the "marketing

trumps safety" discussions regarding Accutane and depression; (2)

Ellison's comments that defendants' investment strategy was to

"feed the goose that lays the golden egg"; and (3) defendants'

failure to respond to the FDA's query regarding IBD reversibility.

Because the significance or weight of this evidence is a matter

for the trier of fact, we conclude that it was sufficient to

preclude summary judgment.

 In granting summary judgment, the trial judge adopted a view

similar to defendants' conclusory assertion that "no reasonable

jury could conclude that Accutane's 2002 warnings failed to

adequately warn prescribers of the risk of IBD." The judge

 46 A-4760-14T1
similarly concluded that the warnings are "clear, accurate and

unambiguous," and that the facts demonstrate

 the labeling and all the warning literature
 issued to physicians by the manufacturer very
 ably disclose with ample detail and intensity
 the risks associated with taking Accutane.
 Viewed objectively, it is a striking package
 of information for introducing a medication
 to a prescribing physician. Any physician of
 ordinary skill, care and diligence who ignored
 [d]efendants' warning system did his/her
 patients a disservice. Such warnings are
 entitled to the benefit of our state's
 rebuttable presumption of adequacy and are
 deemed adequate as a matter of law.

 We reject the judge's determination that the warning was

clear enough to negate a trial on the issue. The PLA provides that

a manufacturer shall be liable for harm caused by a product that

was "not reasonably fit, suitable or safe for its intended purpose"

because it "failed to contain adequate warnings." N.J.S.A. 2A:58C-

2. A manufacturer "shall not be liable for harm caused by a failure

to warn if the product contains an adequate warning," which is

defined as

 one that a reasonably prudent person in the
 same or similar circumstances would have
 provided with respect to the danger and that
 communicates adequate information on the
 dangers and safe use of the product, taking
 into account . . . in the case of prescription
 drugs . . . the characteristics of, and the
 ordinary knowledge common to, the prescribing
 physician. . . .

 [N.J.S.A. 2A:58C-4.]

 47 A-4760-14T1
The PLA thereby incorporates the "learned intermediary" doctrine

under which a pharmaceutical manufacturer's duty to warn about the

dangers of prescription drugs runs to the physician, not the

patient. Perez, supra, 161 N.J. at 10; Niemiera, supra, 114 N.J.

at 559. "A product warning or instruction that does not comport

with" N.J.S.A. 2A:58C-4 is "defective." Banner, supra, 383 N.J.

Super. at 375.

 Consequently, we reverse because we substantially agree with

the views expressed by Judge Higbee when she denied summary

judgment on this same issue. Judge Higbee emphasized, as do we,

that the summary-judgment procedure required a consideration of

the evidence in the light most favorable to plaintiffs:

 Looking at the facts in [the] light most
 favorable to plaintiff, the question is does
 the warning convey in a clear, concise, and
 sufficiently forceful way the risk of the
 patient developing IBD which is a severe life
 changing condition that is permanent even
 after the drug is discontinued?

 It may be that the facts about the disease are
 not as represented by plaintiff's expert, but
 for purposes of this motion the Court must
 assume that Accutane causes IBD which is very
 different from transient gastrointestinal
 problems associated with many medications.
 Even if the jury finds that plaintiff's
 allegations about Accutane and IBD are all
 true, they still can find this warning is
 adequate. The jury can accept that even if
 Accutane probably "causes" IBD, the words
 "associated with" are sufficient. A warning

 48 A-4760-14T1
 can be adequate without using the word
 "causes," but it can also be inadequate
 depending on all the facts.

 The jury may conclude this warning adequately
 conveys to doctors the nature of the risk
 because all doctors should understand IBD is
 permanent and serious, but plaintiffs point
 out that doctors who prescribe Accutane are
 usually dermatologists, not gastroenterolo-
 gists. A jury could decide the second and
 third sentence [in the warning] suggests to a
 doctor the lesser more transient conditions
 of diarrhea and gastrointestinal pain that may
 persist after removal from the drug, but which
 eventually resolves especially by saying the
 drug should be discontinued if there are these
 common GI symptoms. This may be found to imply
 to the physicians that stopping the treatment
 would prevent the development of IBD.

 A drug label does not have to have the best
 possible warning, but it must be sufficient
 to adequately convey the nature, extent, and
 seriousness of the risk in a clear unambiguous
 way to the prescribers of the drug. In this
 case, as in most cases, the sufficiency of the
 warning is for the jury.

 The bottom line is this [c]ourt cannot find
 as a matter of law that this warning was
 inadequate, but also cannot find it was
 adequate as a matter of law.

 In addition, in denying defendants' omnibus motion for

summary judgment on the post-2000 package insert and the January

2001 Medication Guide warnings, Judge Higbee found that:

 The question now is does the language in the
 patient guide strengthen the 2000 warning and
 make it so clear that the issue of adequacy
 [] should be taken from the jury. As the
 plaintiffs point out, the new language itself

 49 A-4760-14T1
 does not mention IBD. In fact, the new
 language generally refers to "the liver,
 pancreas, and bowel (intestines)." It is so
 general it could be found to weaken the
 information in the label, not strengthen it.
 There is no direct reference to IBD.

 The Medication Guide also states "[the
 symptoms] may not get better even after you
 stop taking Accutane." (emphasis added). It
 is not disputed that if you have IBD, you will
 not get "better," in the sense you will ever
 be cured.

 Additionally, the plaintiffs point out (and
 the defendants ignore) additional language in
 the Medication Guide in a paragraph at the
 bottom of the "serious side effects" listings.
 The language states that "[i]f [the symptoms
 are] not treated, they could lead to serious
 health problems. Even if these problems are
 treated, they may not clear up after you stop
 taking Accutane." (emphasis added). The "could
 lead" and "may not" language are ambiguous.
 The ambiguity of the warnings reflects the
 defendants' position that there is no proof
 of causation. Since the [c]ourt must accept
 all facts in favor of the plaintiff, including
 causation, which four juries have found does
 exist, "could lead" and "may not" are just not
 direct enough to render the warning adequate
 as a matter of law even if they directly
 discussed IBD which they do not. Again, it may
 be adequate, but it clearly is a jury
 question.

 To be sure, defendants' arguments are colorable. We have

discussed the legal standards, which saddle plaintiffs with the

obligation to demonstrate that a reasonably prudent manufacturer

would have provided a stronger warning than the 2000 warning:

"Accutane has been associated with inflammatory bowel disease."

 50 A-4760-14T1
The post-2000 warnings may be clearer than the 1984 warnings but

we are satisfied, substantially for the reasons expressed by Judge

Higbee quoted above, that plaintiffs have presented a sufficient

issue of material fact about the warning's adequacy. Defendants

still failed to use any causal language, warning instead that IBD

was "associated" with Accutane use, even though there was evidence

from which a jury could find that defendants had internally

concluded there was a causative effect. The word "associated" is

susceptible of different meanings and, when viewed in the light

most favorable to plaintiffs, would appear not to be sufficiently

"intens[e]" or "striking" – words used by the judge to describe

the warning – to suggest to a reasonably prudent reader that the

drug being "associated" with IBD was the same as the drug causing

IBD.14

14
 We are not persuaded that our decision in Spinden v. Johnson &
Johnson, 177 N.J. Super. 605, 606 (App. Div.), certif. denied, 87
N.J. 376 (1981) requires a different result. There, the plaintiff
alleged warnings contained on packages of Ortho-Novum (birth
control pills) which referred to the risk of developing
thromboembolic disease were inadequate. The package insert
provided in relevant part that:

 An increased risk of thrombo-embolic disease
 associated with the use of hormonal
 contraceptives has now been shown in studies
 conducted in both Great Britain and the United
 States.

 51 A-4760-14T1
 For these reasons, we reverse the entry of summary judgment

in favor of defendants.

 E

 Plaintiffs also argue that the trial judge erred in rejecting

Judge Higbee's prior rulings on the same subject matter. Although

not necessary to our disposition – since we reverse on the merits

– we briefly observe that we find no particular error in the

judge's revisiting of these issues.

 The so-called law-of-the-case doctrine is a non-binding,

discretionary rule designed to prevent litigation of a previously

 Retrospective studies of morbidity in Great
 Britain and studies of morbidity in the United
 States have shown a statistically significant
 association between thrombophlebitis,
 pulmonary embolism and cerebral thrombosis and
 the use of oral contraceptives. . . .

 [Id. at 607.]

The trial judge in Spinden found these warnings were adequate as
a matter of law and granted an involuntary dismissal. Ibid. In
affirming, we found the "trial judge's reasoning that the phrase
'a statistically significant association' means a cause and effect
relationship seems correct," mainly because it was expressed in
the context of a clearer and more elaborate warning about "'an
increased risk of thromboembolic disease associated with the use
of hormonal contraceptives . . . .'" Id. at 608 (quoting Goodson
v. Searle Labs, 471 F. Supp. 546, 547 (D. Conn. 1978)). This case
is distinguishable because here the label warns only that Accutane
has been "associated" with IBD – a term which, when used in a
label, even defendants' own employees conceded could be
susceptible to different meanings.

 52 A-4760-14T1
resolved issue. Lombardi v. Masso, 207 N.J. 517, 538 (2011). The

doctrine requires "judges to respect unreversed decisions made

during the trial by the same court or a higher court regarding

questions of law." Sisler v. Gannett Co., 222 N.J. Super. 153, 159

(App. Div. 1987), certif. denied, 110 N.J. 304 (1988). "Prior

decisions on legal issues should be followed unless there is

substantially different evidence at a subsequent trial, new

controlling authority, or the prior decision was clearly

erroneous." Ibid.

 An order denying summary judgment, however, "is not subject

to the law of the case doctrine because it decides nothing and

merely reserves issues for future disposition." Gonzalez v. Ideal

Tile Importing Co., 371 N.J. Super. 349, 356 (App. Div. 2004),

aff’d, 184 N.J. 415 (2005), cert. denied, 546 U.S. 1092, 126 S.

Ct. 1042, 163 L. Ed. 2d 857 (2006). The denial of summary judgment

"is always interlocutory, and never precludes the entry of judgment

for the moving party later in the case . . . ." Hart v. City of

Jersey City, 308 N.J. Super. 487, 498 (App. Div. 1998).

 Because the prior ruling represented a denial of summary

judgment, the doctrine had no application. The trial judge was

entitled to revisit – in a sound exercise of discretion – that

interlocutory disposition at any time prior to entry of final

 53 A-4760-14T1
judgment in the interests of justice. R. 4:42-2.15

 II

 The 514 plaintiffs involved in the second appeal filed MCL

Accutane complaints against defendants on various dates between

2005 and 2013. The long-form complaint, designated for use in

these MCL cases, contains their claim of defendants' failure to

warn under New Jersey's PLA, "and/or [sic] the analogous law of

plaintiff's state(s) of ingestion and/or [sic] prescription."

 In January 2015, defendants moved for summary judgment in a

case scheduled for trial a few months later on the adequacy of the

post-2002 warnings under either New Jersey or Washington law; that

plaintiff, however, dismissed her case for unrelated reasons.

Defendants then amended their motion for summary judgment based

on the adequacy of the warnings in all MCL cases where plaintiffs

first ingested Accutane after April 10, 2002.

 In deciding that motion, the judge issued a written opinion

explaining that, in his view, the warnings given by defendants on

or after April 10, 2002, were adequate as a matter of law under

15
 Even if it were otherwise, the law-of-the-case doctrine is not
immutable; it is always to be balanced against "factors that bear
on the pursuit of justice," and should never "be used to justify
an incorrect substantive result." Hart, supra, 308 N.J. Super. at
498; see State v. K.P.S., 221 N.J. 266, 276 (2015); Toto v.
Princeton Twp., 404 N.J. Super. 604, 618 (App. Div. 2009).

 54 A-4760-14T1
the PLA. The judge also sought supplementation of the parties'

submissions to allow for a determination as to which states

plaintiffs had ingested Accutane other than New Jersey during the

same time period.

 The judge heard additional argument regarding any choice-of-

law determinations necessary in claims in which it was alleged

Accutane was ingested in places other than New Jersey. He also

sought the parties' views about the significance of counsel's

initial request for MCL treatment of these cases.16 At that time,

the judge provided a preliminary view:

 an objective reading of [counsel's]
 representations to the court indicates that
 [p]laintiffs wished to consolidate the sixty-
 eight cases in order that a determination may
 be made regarding "whether defendant violated
 the New Jersey Products Liability Act in its
 marketing and sale of Accutane."

16
 The judge referred to a January 25, 2005 letter, submitted by
plaintiffs' counsel, pursuant to Rule 4:38A, for classification
of Accutane cases as "a mass tort" (now known as "multicounty
litigation" or "MCL") and centralized case management. In that
letter, counsel advised of the sixty-eight Accutane cases pending
in New Jersey (sixty-two were venued in Atlantic County) and the
expectation of many more; he also asserted:

 These claims share common issues of law and
 fact, including whether Accutane causes the
 injuries alleged by plaintiffs, whether
 defendant adequately warned of the risks of
 ingesting Accutane, and whether defendant
 violated the New Jersey Products Liability Act
 in its marketing and sale of Accutane.

 [Emphasis added.]

 55 A-4760-14T1
 This preliminary opinion is deduced from the
 fact that of the sixty-eight cases referenced
 in the letter, only two were brought by New
 Jersey residents. There is nothing in [the
 letter] – nor [a] follow-up letter of March
 15, 2005, referencing "95 cases pending in New
 Jersey" – which advises . . . the [p]laintiffs
 from "around the country . . . in
 geographically disperse areas" wish to bring
 the law of their states with them to New
 Jersey.

 There are now 4,600(+) cases pending in the
 Accutane litigation. Of these, 35 are known
 to be [pursued by] New Jersey residents. The
 need for a state-by-state, choice-of-law
 analyses, and a [p]laintiff-by-[p]laintiff
 fact discovery deposition of every prescribing
 physician of the remaining [p]laintiffs was
 neither requested, advised of, nor alluded to
 by [counsel] in his letters [seeking MCL].

 Regardless of what may have transpired in
 prior proceedings in the Accutane MCL, I have
 serious concerns as to this court's obligation
 to consider [p]laintiffs' claims under any
 legal standards but those of the New Jersey
 Products Liability Act, as requested [in the]
 January 25, 2005 letter.

 Eventually, the judge determined the PLA applied to claims

asserted by out-of-state plaintiffs because of counsel's statement

in the Rule 4:38A petition for MCL. And, because the judge had

determined that application of the PLA warranted entry of summary

judgment as to the post-2002 warnings were adequate as a matter

of law, he granted summary judgment in those matters. For reasons

set forth in our disposition of A-4760-14, we have determined that

 56 A-4760-14T1
the judge's application of the PLA and New Jersey law was erroneous

and that the adequacy of the warnings could not be resolved as a

matter of law in any case in which New Jersey law applied.

Consequently, if we were to agree with the propriety of applying

New Jersey law to claims asserted by out-of-state plaintiffs, we

would reverse the summary judgments entered against those out-of-

state plaintiffs.

 The judge, however, also provided an alternative basis for

granting summary judgment in many of the cases commenced by out-

of-state plaintiffs. Invoking the interests of "judicial economy,"

the judge conducted a choice-of-law analysis and found that, upon

applying the law of the jurisdictions in which these out-of-state

plaintiffs resided and ingested Accutane, defendants were entitled

to summary judgment. The judge granted summary judgment against

plaintiffs who resided in and ingested Accutane in twenty-one

other jurisdictions (Alabama, California, Colorado, Florida,

Georgia, Illinois, Indiana, Kentucky, Maryland, Mississippi,

Missouri, New Hampshire, New York, North Dakota, Puerto Rico,

Tennessee, Texas, Virginia, Washington, Wisconsin, and Wyoming).

He denied summary judgment under the laws of twenty other

jurisdictions (Arkansas, Connecticut, Delaware, District of

Columbia, Idaho, Iowa, Kansas, Maine, Massachusetts, Minnesota,

Montana, Nevada, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode

 57 A-4760-14T1
Island, South Carolina, Utah and Vermont). With regard to

plaintiffs residing in three other jurisdictions (Louisiana,

Nebraska, and South Dakota), the judge deemed it appropriate to

apply New Jersey law. On July 24, 2015, the judge entered an order

dismissing 514 Accutane cases with prejudice.

 Plaintiffs appeal, and defendants cross-appeal from that

order. In examining the issues posed in this appeal, we (a)

consider – and reject – the judge's determination that statements

made by the attorney who sought mass tort designation constituted

a waiver of the out-of-state plaintiffs' right to an appropriate

choice-of-law analyses. We then (b) consider – and conclude – that

application of New Jersey's choice-of-law rules requires adoption

of the substantive law of the jurisdictions in which plaintiffs

resided and ingested Accutane. And, we lastly examine (c) the

judge's specific determinations about the law of the other

applicable jurisdictions and whether or to what extent the law of

those other jurisdictions support the judge's rulings on

defendants' summary judgment motion in those cases.

 A

 Given the language of counsel's representations in seeking

the Supreme Court's May 2, 2005 order that granted MCL treatment

of these cases – which we have already partially quoted in footnote

 58 A-4760-14T1
16, supra – the judge held that he was required to consider

 all of the remaining claims and issues – in
 this instance, warning adequacy – under New
 Jersey law. This is so because it was the
 [p]laintiffs who framed the limits of the MCL
 jurisdiction by asking the court to
 consolidate all claims on the question of
 whether [d]efendants violated the [PLA] in its
 marketing and sale of Accutane. By invoking
 New Jersey law, [counsel's] letter highlights
 why New Jersey law should control this MCL.
 Plaintiffs wanted the benefit of having their
 claims heard under the [PLA]. How this court's
 predecessor handled this issue or the fact
 that cases were tried under California and
 Florida law is of no moment. The
 representations of [p]laintiffs' petition for
 MCL designation are unambiguous, and request
 [] determination[s] under the [PLA].

Citing P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 154 (2008),

where the Court recognized that "[t]he interests of judicial

administration" require "consider[ation] [of] practicality and

ease of application, [which] further the values of uniformity and

predictability," the judge chose not to perform a choice-of-law

analysis in this part of his opinion, stating instead that such

analyses would not promote "the values of uniform and

predictability" but instead would:

 (a) place Atlantic County jurors in the
 incongruous position of hearing claims under
 another state's law; (b) likely generate
 inconsistent rulings; (c) as illustrated by
 the decision in Sager . . . likely generate a
 multiplicity of appeals for which there are
 no binding precedents; and (d) impose an

 59 A-4760-14T1
 unreasonable burden upon the resources of the
 judiciary.

 And, relying on Veazey v. Doremus, 103 N.J. 244, 248 (1986),

where the Court observed that choice-of-law questions are "to be

determined on an issue-by-issue basis," the judge declared that a

choice-of-law analysis in those cases that might arguably be

governed by the law of forty-four other jurisdictions would impose

an undue burden on "the resources of the judiciary," which he

rhetorically enumerated:

 First, is it likely that at the time of
 entering its [o]rder of May 2, 2005, our
 Supreme Court contemplated such an imbroglio
 being thrust upon our trial courts?

 Second, is it reasonable for the New Jersey
 [c]ourt [s]ystem to assume responsibility for
 resolving the claims of thousands of parties
 from scores of foreign jurisdictions on
 litigation involving cutting edge issues of
 science and law, all the while applying the
 law of other states, many of which express
 standards incompatible with the [PLA]?

 Third, in ten years there has been little to
 no progress toward resolving this MCL. Is
 there any reason to believe that this MCL will
 be resolved within the next ten years by
 applying choice-of-law analyses to each matter
 that is selected for trial?

 Fourth, is there another state court system
 in the United States which has welcomed such
 a flood of litigation against a corporate
 citizen of that state wherein each of the
 [p]laintiffs get to bring the law of their
 home state with them?

 60 A-4760-14T1
The judge responded that, from his "perspective," the answers to

all these question was: "not likely." He consequently found that:

 As framed by plaintiffs' counsel, the choice-
 of-law analysis for label adequacy would have
 to be considered plaintiff-by-plaintiff,
 doctor-by-doctor, totally dependent upon the
 testimony of a prescribing physician. Such a
 subjective standard militates against [a]
 philosophy of creating a MCL proceeding. As
 can be readily deduced, the choice-of-law
 considerations raised by the Accutane MCL are
 not those of a discrete and solitary claim
 such as that in Camp Jaycee involving a single
 claimant and a conflict regarding the
 competing public policy interests over
 charitable immunity. Here, there are thousands
 of claimants from scores of states; the
 conflicting interests and equitable
 considerations are far more complex, or one
 might say, muddled.

The judge concluded, with an additional emphasis on the age and

status of this MCL litigation, that "[a]pplying New Jersey law to

all the outstanding failure to warn cases will inject uniformity

and predictability which are sorely lacking." We reject the judge's

reasoning.

 We turn first to the judge's determination that statements

made by an attorney – who had yet to be designated liaison counsel

– were binding on all out-of-state plaintiffs in this MCL. To be

sure, we would agree that a statement regarding the substantive

law to be applied to a claim may, at times, be binding upon parties

and, also, that parties may stipulate to the application of the

 61 A-4760-14T1
substantive law even if a proper choice-of-law analysis would

generate a different result. See Fairfax Fin. Holdings Ltd. v.

S.A.C. Capital Mgmt., __ N.J. Super. __, __ (App. Div. 2017) (slip

op. at 36-40). But the judge's reliance on the 2005 request by

counsel for MCL treatment of these and other Accutane cases is,

at best, only a factor in the choice-of-law analysis, not its

alpha and omega.

 In explaining, we start by rejecting the relevance or accuracy

of the judge's enumerated rhetorical concerns. As to the first,

only the Supreme Court can say, but we would think a future need

to conduct multiple or many choice-of-law analyses was

contemplated. The second rhetorical question seems to have no

bearing on the propriety of choice-of-law analyses in the cases

commenced by out-of-state plaintiffs. Although additional legal

questions may be presented for the courts, as they are here, those

questions are hardly so difficult as to represent an undue burden.

Nor has it been shown – as the judge suggests in his third

rhetorical question – that these choice-of-law questions have been

the cause of any perceived delay during the pendency of the MCL.

The fourth rhetorical – in which the judge questioned whether any

other state would undertake an MCL like this – seems irrelevant

in considering whether the court should take the easy way out and

simply apply New Jersey law in all cases because those plaintiffs

 62 A-4760-14T1
chose to sue in defendants' home state.

 Second, we find no evidence other than counsel's loose

statement in a letter written more than a decade ago to support a

waiver of all appropriate choice-of-law issues. Rule 4:38A

recognizes the authority of the Supreme Court to "designate a case

or category of cases as Multicounty Litigation [MCL] to receive

centralized management in accordance with criteria and procedures

promulgated by the Administrative Director of the Courts upon

approval by the Court." Here, in applying for MCL, counsel

represented in 2005 that the Accutane claims shared common issues

of law and fact, including "whether defendant violated the New

Jersey Products Liability Act in its marketing and sale of

Accutane." Counsel submitted that application before the selection

of liaison counsel and before the filing of the complaints at

issue on appeal; he did not have the authority to, nor did he,

stipulate to the choice of law for these plaintiffs. See, e.g.,

Banner v. Hoffmann-La Roche Inc., 383 N.J. Super. 364, 373 (App.

Div. 2006), certif. denied, 190 N.J. 393 (2007). For that reason

alone, we think it inimical to a just determination of the many

pending Accutane cases to interpret the 2005 letter as a waiver

of a choice-of-law analysis for out-of-state plaintiffs. Moreover,

this matter has long proceeded as if choice-of-law analyses would

occur. For example, after entry of the MCL order, plaintiffs filed

 63 A-4760-14T1
long-form complaints alleging claims for failure-to-warn under New

Jersey's PLA "and/or [sic] the analogous law of plaintiff's

state(s) of ingestion and/or [sic] prescription." Our courts have

also addressed choice-of-law issues in cases contained in this MCL

matter without concerns for the so-called administrative problems

cited by the trial judge. See, e.g., McCarrell II, supra, 227 N.J.

at 582-99 (considering whether New Jersey's or Alabama's statute

of limitations applied). And, although no section of the Second

Restatement specifically addresses mass torts, we deem it

inappropriate to conclude that by participating in mass tort

litigation plaintiffs waive their right to a choice-of-law

analysis when the court is presented with a potential conflict

regarding the application of state law.17

17
 As the popularity of mass torts at both the federal and state
levels gained in popularity, commentators have argued in favor of
modification to the choice-of-law practices to allow application
of a single state's law in complex litigation. See Larry Kramer,
Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547 (1996)
(challenging the "consensus, at least, that ordinary choice-of-
law practices should yield in suits consolidating large numbers
of claims and that courts should apply a single law in such
cases"). In 1993, the American Law Institute adopted and submitted
to Congress for enactment, statutory recommendations for mass
torts. American Law Institute, Complex Litigation Project,
Proposed Final Draft (May 13, 1993). The Project proposed a set
of choice-of-law rules for "mass-tort" actions transferred to
federal courts, not state courts. Under that proposal, a court
would consider a list of enumerated factors modeled on the Second
Restatement, "with the object of applying, to the extent feasible,
a single state's law to all similar tort claims being asserted

 64 A-4760-14T1
 We, thus, reject this procedural bar to otherwise required

choice-of-law analyses in these matters.

 B

 As a result of the judge's erroneous finding of a waiver, we

must consider whether a choice-of-law analysis nevertheless

requires application of New Jersey law or whether the law of other

jurisdictions should apply.

 As the forum state, we apply New Jersey choice-of-law rules.

McCarrell II, supra, 227 N.J. at 584. When a conflict of

substantive law arises – regardless of whether it happens to occur

in MCL litigation – our courts apply the principles set forth in

sections 146, 145, and 6 of the Restatement (Second) of Conflicts

of Law. McCarrell II, supra, 227 N.J. at 591. "Multi-faceted

choice-of-law principles, such as those expressed in the Second

Restatement, have been developed to assist judges in resolving

such conflicts." Ginsberg ex rel. Ginsberg v. Quest Diagnostics,

Inc., 441 N.J. Super. 198, 223 (App. Div. 2015), aff'd, 227 N.J.

7 (2016). See Kramer, supra, 71 N.Y.U. L.Rev. at 549 (recognizing

that "[b]ecause choice of law is part of the process of defining

the parties' rights, it should not change simply because, as a

against a defendant." Id. at § 6.01 (emphasis added). ALI's
Project, however, was not enacted.

 65 A-4760-14T1
matter of administrative convenience and efficiency, we have

combined many claims in one proceeding; whatever choice-of-law

rules we use to define substantive rights should be the same for

ordinary and complex cases"). Our courts will also render, when

necessary, multiple individualized choice-of-law determinations

within the same suit. At times that choice may vary from one

defendant to another, Ginsberg, supra, 227 N.J. at 18, or from one

plaintiff to another, Fairfax, supra, __ N.J. Super. at __ (slip

op. at 35-36). That said, there may be times when an

individualized, party-by-party determination is not feasible. The

Ginsberg Court explained that in

 very complex cases with many defendants and
 multiple claims, a defendant-specific choice-
 of-law analysis may generate a jury charge
 that is unwieldy and unclear. . . . In a
 complex case with many parties from different
 states, the trial court retains the discretion
 to decline a defendant-by-defendant approach
 and, utilizing a Restatement [sections] 146,
 145 and 6 analysis as described above, apply
 the law of a single state to claims asserted
 against all defendants.

 [Ginsberg, supra, 227 N.J. at 20.]

 Here, in contrast, although plaintiffs' claims were

coordinated for administrative purposes, each plaintiff filed a

separate complaint. Some cases have been tried individually and

others were tried with plaintiffs from the same state, thereby

alleviating any jury confusion about the applicable law that could

 66 A-4760-14T1
compromise the trial in the manner of concern to the Court in

Ginsberg. Clearly, the MCL claims pursued by numerous plaintiffs

in separate proceedings does not pose the same potential for jury

confusion as in Ginsberg, where plaintiffs pursued claims against

numerous defendants of different jurisdictions in the same

proceeding. We therefore reject the argument that simplification

of procedures and uniformity of results should govern the choice-

of-law questions presented because plaintiffs in the cases

involved in this appeal reside and ingested Accutane elsewhere.

 In the alternative, the trial judge conducted a choice-of-

law analysis utilizing sections 146, 145, and 6 of the Second

Restatement. He found the law of the state of injury applied in

forty-one of the forty-four jurisdictions. We agree with that

analysis, with the exception that we conclude the law of the

jurisdiction of the injury applied in all these cases, not just

forty-one of forty-four.

 "The analytical framework for deciding how to resolve a

choice-of-law issue is a matter of law." McCarrell II, supra, 227

N.J. at 583; see also Mastondrea v. Occidental Hotels Mgmt. S.A.,

391 N.J. Super. 261, 283 (App. Div. 2007). Review of the trial

judge's choice-of-law determination is thus de novo. McCarrell,

supra, 227 N.J. at 583-84.

 New Jersey's "choice-of-law jurisprudence has striven to

 67 A-4760-14T1
structure rules that will lead to predictable and uniform results

that are fair and just and that will meet the reasonable

expectations of the parties." McCarrell II, supra, 227 N.J. at

573. The first inquiry is "whether the laws of the states with

interests in the litigation are in conflict." Id. at 584. If there

is no actual distinction, there is no choice-of-law issue to be

resolved, and the forum state applies its own substantive law.

Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615, 621 (2007); see also

DeMarco v. Stoddard, 223 N.J. 363, 383 (2015), cert. denied, ___

U.S. ___, 137 S. Ct. 44, 196 L. Ed. 2d 28 (2016). The trial judge

did not make any specific findings as to how the laws conflict but

simply proceeded on an assumption of a conflict.

 As we have already said here, the PLA, in combination with

common law principles, provides that a manufacturer shall be liable

for harm caused by a product that was "not reasonably fit, suitable

or safe for its intended purpose" because it "failed to contain

adequate warnings." N.J.S.A. 2A:58C-2. The PLA incorporates the

"learned intermediary" doctrine by which a manufacturer's duty to

warn about the dangers of prescription drugs runs to the physician,

not the patient. N.J.S.A. 2A:58C-4; Perez, supra, 161 N.J. at 10;

Niemiera, supra, 114 N.J. at 559. Significantly, the PLA also

provides that:

 68 A-4760-14T1
 If the warning or instruction given in
 connection with a drug or device or food or
 food additive has been approved or prescribed
 by the federal Food and Drug Administration
 under the "Federal Food, Drug, and Cosmetic
 Act," . . . a rebuttable presumption shall
 arise that the warning or instruction is
 adequate. . . .

 [N.J.S.A. 2A:58C-4.]

 In Perez, supra, 161 N.J. at 25, the Court held that "[f]or

all practical purposes, absent deliberate concealment or

nondisclosure of after-acquired knowledge of harmful effects,

compliance with FDA standards should be virtually dispositive of

[failure-to-warn claims]." See Kendall I, supra, 209 N.J. at 195

(where the Court recognized that "in Perez we created what can be

denominated as a super-presumption").

 Although the other forty-four jurisdictions recognize

products liability claims based on a failure to adequately warn,

and the majority of those jurisdictions have adopted the learned

intermediary doctrine, there is a conflict between the laws of

most of the other implicated jurisdictions because only three of

the forty-four implicated jurisdictions have adopted statutory

rebuttable presumptions of adequacy for FDA-approved warnings

(Utah, Tennessee, and Texas).18 Those presumptions, however, appear

18
 See Utah Code Ann. § 78B-6-703 (2017) (rebuttable presumption
that product is free from any defect where in conformance with

 69 A-4760-14T1
different from New Jersey's because courts in those states have

not applied their rebuttable presumptions in precisely the same

way as the PLA's statutory presumption or determined in the same

way whether or to what extent the presumption may be overcome.

That is, in New Jersey it has been recognized that the PLA's

statutory presumption may be overcome by a showing of deliberate

concealment or nondisclosure of after-acquired knowledge of

harmful effects, Perez, supra, 161 N.J. at 25, or substantial

evidence of economically driven manipulation of the post-market

regulatory process, McDarby, supra, 401 N.J. Super. at 63-66.

Other states with a statutorily-created rebuttable presumption do

not appear to either recognize those exceptions or in quite the

same way.

 Rather than analyze and compare each jurisdiction looking for

a conflict – or the absence of a conflict – we view our PLA as

sufficiently different from most, if not all, the other competing

jurisdictions as to warrant an assumption that all forty-four

jurisdictions are in conflict with (or at least different from)

New Jersey law on the particular questions posed by defendants'

government standards); Tenn. Code Ann. § 29-28-104 (2017)
(compliance with government standards creates rebuttable
presumption that the product "is not in an unreasonably dangerous
condition"); Tex. Civ. Prac. & Rem. § 82.007 (2015) (rebuttable
presumption that manufacturer is not liable for failure to provide
adequate warnings if the warnings were FDA-approved).

 70 A-4760-14T1
motion for summary judgment.

 Next, a court must identify "the state that is the place of

injury and presume[] that the law of that state governs the

action." Ginsberg, supra, 227 N.J. at 12. Section 146 of the Second

Restatement states that in an action for personal injury,

 the local law of the state where the injury
 occurred determines the rights and liabilities
 of the parties, unless, with respect to the
 particular issue, some other state has a more
 significant relationship under the principles
 stated in [section] 6 to the occurrence and
 the parties, in which event the local law of
 the other state will be applied.

 It is undisputed that in the Accutane cases before us there

are plaintiffs who resided – and ingested Accutane – in forty-four

other jurisdictions. Section 146 recognizes those forty-four

jurisdictions as "likely to have the predominant, if not exclusive,

relationship to the parties and issues in the litigation." Camp

Jaycee, supra, 197 N.J. at 144. That presumption is then "tested

against the contacts detailed in section 145 and the general

principles outlined in section 6 of the Second Restatement." Id.

at 136. A court must decide "whether the presumption in favor of

the law of the place of injury has been overcome by virtue of a

competing state's 'more significant relationship to the parties

and issues.'" Ginsberg, supra, 227 N.J. at 12 (quoting Camp Jaycee,

supra, 197 N.J. at 143). When "another state has a more significant

 71 A-4760-14T1
relationship to the parties or issues," the presumption has been

overcome. Camp Jaycee, supra, 197 N.J. at 136.

 Section 145(2) of the Second Restatement lists several

factors to be weighed in identifying the state with the most

significant interests:

 (a) the place where the injury occurred,

 (b) the place where the conduct causing the
 injury occurred,

 (c) the domicil, residence, nationality, place
 of incorporation and place of business of the
 parties, and

 (d) the place where the relationship, if any,
 between the parties is centered.

Application of those contacts supports a finding that the other

jurisdictions have a more significant relationship to these

lawsuits than New Jersey. Plaintiffs' injuries occurred in the

other jurisdictions, plaintiffs resided there, and plaintiffs were

prescribed and ingested the drug there. See Cornett v. Johnson &

Johnson, 414 N.J. Super. 365, 378-80 (App. Div. 2010), aff'd as

modified, 211 N.J. 362 (2012); Yocham v. Novartis Pharms. Corp.,

736 F. Supp. 2d 875, 882 (D.N.J. 2010).

 It bears further mention that these contacts with plaintiffs'

home states were not fortuitous. Defendants deliberately marketed

and sold their product in those jurisdictions with the intention

that physicians prescribe and patients take the drug in those

 72 A-4760-14T1
jurisdictions. The locus of the parties' relationship does not

compel a different result because, although defendants are located

and issued its warnings from New Jersey, plaintiffs and their

physicians received them and suffered from their omission in the

other jurisdictions.

 Next, in measuring the significance of the section 145

contacts, courts look to section 6's cornerstone principles "to

determine whether the presumption has been overcome." Camp Jaycee,

supra, 197 N.J. at 143. In tort cases, the section 6 factors may

be grouped into five categories: "(1) the interests of interstate

comity; (2) the interests of the parties; (3) the interests

underlying the field of tort law; (4) the interests of judicial

administration; and (5) the competing interests of the states."

Fu v. Fu, 160 N.J. 108, 122 (1999). These factors "are not

exclusive," and their weight may vary "depending upon the

circumstances presented." Ginsberg, supra, 441 N.J. Super. at 239.

 Here, as in Camp Jaycee, supra, 197 N.J. at 148, the competing

interest of the state and relevant tort law principles overlap.

New Jersey and all the other relevant jurisdictions have

established failure-to-warn laws intended to compensate injured

plaintiffs while deterring the manufacture and distribution of

unsafe products. See Reglan Litig., supra, 226 N.J. at 335; Gantes

v. Kason Corp., 145 N.J. 478, 490 (1996). "[O]f the two policy

 73 A-4760-14T1
goals, the first is more important." Dreier, Keefe & Katz, supra,

at 563. Consequently, the state where the injured person resides

"is generally considered paramount." Ibid.

 Our Legislature enacted the PLA "as a remedial measure to

limit the liability of manufacturers by establishing 'clear rules

with respect to certain matters'" relating to actions for damages

for harm caused by products, and "[i]n particular," to "reduce the

burden on manufacturers of FDA-approved products resulting from

products liability litigation." Kendall I, supra, 209 N.J. at 194

(quoting N.J.S.A. 2A:58C-1(a)). The PLA "impliedly accepts that

the presumption of adequacy will not be rebutted in all cases" and

"accepts FDA regulation as sufficient, at least in part, to deter

New Jersey pharmaceutical companies from manufacturing unsafe

prescription drugs." Rowe, supra, 189 N.J. at 625.

 Arguably, there are conflicting policies – New Jersey's

interest in the uniform application of its limitation of a

manufacturers' liability and in deterring unsafe products – and

the competing interests of the other jurisdictions in regulating

the adequacy of warnings and in compensating injured victims. At

best, those interests are in equipoise. As we have already

observed, the fact that plaintiffs suffered injuries in other

jurisdictions was not fortuitous; defendants chose to market and

sell their product there. If the other jurisdictions' products

 74 A-4760-14T1
liability laws are to have any deterrent effect it must apply in

the state where the plaintiff was injured. New Jersey's "interest

in deterring local manufacturing corporations from providing

inadequate product warnings, within the context of an FDA approved

drug," does not clearly outweigh the laws of the other

jurisdictions who have an interest in protecting their citizens

from harm and in compensating their citizens for injuries. See id.

at 629-30.

 Interstate comity seeks to "further harmonious relations

between the states and to facilitate commercial intercourse

between them," Restatement, supra, § 6 cmt. d; see Camp Jaycee,

supra, 197 N.J. at 152, by ascertaining "whether application of a

competing state's law would frustrate the policies of other

interested states," Fu, supra, 160 N.J. at 122. By the same token,

this factor "must not be overemphasized," because, to some extent,

"every tort rule is designed both to deter other wrongdoers and

to compensate the injured person." Restatement, supra, § 145 cmt.

c.

 Similarly, application of New Jersey law that limits

liability for FDA-approved warnings might frustrate the other

states' policies in deterring a broader scope of inadequate

warnings and would limit their ability to regulate the conduct of

manufacturers who sell products in their states. See Camp Jaycee,

 75 A-4760-14T1
supra, 197 N.J. at 153. Moreover, New Jersey can continue to

protect its pharmaceutical manufacturers when they sell products

in this state.

 In considering the interests-of-the-parties factor, it would,

generally speaking, "be unfair and improper to hold a person liable

under the local law of one state when he had justifiably molded

his conduct to conform to the requirements of another state."

Ginsberg, supra, 441 N.J. Super. at 243 (quoting Restatement,

supra, § 6 cmt. g). Defendants argue that New Jersey pharmaceutical

manufacturers are justified in expecting that a New Jersey law

designed to "re-balance the law in [their] favor," Rowe, supra,

189 N.J. at 623, would apply if they were sued in New Jersey. In

Camp Jaycee, supra, 197 N.J. at 154, the Court explained that in

Fu, supra, 160 N.J. at 135, it "dismissed the notion that a

corporation could reasonably expect automatic immunization when

conducting affairs outside the state" and observed that "however

reasonable may be a rental agency's reliance on New Jersey's

vicarious liability laws for purposes of an accident in this State,

any blanket reliance on this State's law as a defense to conduct

occurring in a foreign jurisdiction could not be justified."

 Although defendants might legitimately have expected

protection under the PLA's presumption, they could not reasonably

expect that protection to apply in other states with no interest

 76 A-4760-14T1
in reducing the liability burden on New Jersey pharmaceutical

manufacturers. Thus, the application of the laws of other

jurisdictions to these out-of-state claims is consistent with the

reasonable interests of the parties.

 The interests of judicial administration obligate courts to

consider "practicality and ease of application, factors that in

turn further the values of uniformity and predictability." Camp

Jaycee, supra, 197 N.J. at 154. The comments to the Second

Restatement illuminate these interests:

 To the extent that [these values] are attained
 in choice of law, forum shopping will be
 discouraged. These values can, however, be
 purchased at too great a price. In a rapidly
 developing area, such as choice of law, it is
 often more important that good rules be
 developed than that predictability and
 uniformity of result should be assured through
 continued adherence to existing rules.
 Predictability and uniformity of result are
 of particular importance in areas where the
 parties are likely to give advance thought to
 the legal consequences of their transactions.

 [Restatement, supra, § 6 cmt. i.]

Interests of judicial administration should not be accorded undue

weight; they "are of lesser importance and must yield to a strong

state interest implicated by the [other] factors." Fu, supra, 160

N.J. at 124; see also Erny v. Estate of Merola, 171 N.J. 86, 102

(2002). Ultimately, as we observed in Ginsberg, supra, 441 N.J.

Super. at 245, applying one state's law indiscriminately to all

 77 A-4760-14T1
of the claims against out-of-state defendants would be "pragmatic"

but would not promote "a sound or fair result."

 To be sure, as the trial judge observed, MCL litigation poses

unique challenges to judicial administration and efficiency. And

we agree New Jersey's judicial-administration interest should be

given greater weight in an MCL case than in a standard tort case.

Certainly, application of New Jersey's substantive law to the

adequacy of pharmaceutical warnings would, to some degree, present

more efficient results. But this factor should yield to the other

jurisdictions' strong state interests for a number of reasons.

 First, a multistate analysis is feasible in this MCL case.

See Ginsberg, supra, 227 N.J. at 12. As one commentator pointed

out, resolving choice-of-law questions in complex mass tort cases

"may not be fun, but it is far from impossible." Kramer, supra,

71 N.Y.U. L. Rev. at 584. One solution to efficiently resolve MCL

cases is to group cases involving states with similar laws, thereby

reducing the number of conflicts to a manageable number. Such

grouping has, in fact, has already occurred in this MCL litigation.

And modern means of research – Lexis and Westlaw – reduce the

burden of conducting a fifty-state search that would have proved

daunting in former times.

 Second, there is no reason to believe the parties anticipated

that this MCL case would become an "imbroglio being thrust upon"

 78 A-4760-14T1
the court, as viewed by the trial judge. It is likely plaintiffs

expected to try a few "bellwether" cases, thereby "enhancing

prospects of settlement or for resolving common issues or claims."

Perez, supra, 161 N.J. at 7 n.2 (quoting In re Chevron, U.S.A.,

Inc., 109 F.3d 1016, 1019-20 (5th Cir. 1997)). The fact that only

one Accutane MCL case has settled does not weigh in favor of

applying New Jersey's law to all of the pending out-of-state

claims.

 We also reject the notion that application of the substantive

laws of the jurisdiction in which a plaintiff's injury occurred

will encourage a "flood of litigation" against defendants in this

state. Plaintiffs have filed claims in New Jersey because

defendants' business is located here and because the Court approved

the MCL application. Moreover, application of out-of-state law has

resulted in the dismissal of some of the Accutane cases. And we

affirm the dismissal of others here.

 Lastly, the fact that application of other jurisdictions'

laws may lead to inconsistent results does not weigh in favor of

the application of New Jersey law; such results are entirely fair

and appropriate in products liability actions brought by

plaintiffs from different states. See Kramer, supra, 71 N.Y.U. L.

Rev. at 579 (recognizing "[s]ome differences in outcome reflect

the fact that different states with legitimate interests have made

 79 A-4760-14T1
different judgments about how to handle tort problems").

 For these reasons, we are satisfied the presumption in favor

of the law of the state of the injury was not overcome, and we

conclude the trial judge erred in part one of his opinion in

applying New Jersey law to these claims.

 C

 The judge also examined the law of forty-four jurisdictions.

Because we have determined that New Jersey law doesn't provide the

substantive law applicable to claims asserted by plaintiffs who

resided and ingested Accutane in other jurisdictions, the judge's

alternative rulings about the law of those other jurisdictions has

taken on greater relevance.

 We start with the fact that, of the forty-four jurisdictions,

the judge found application of the law of eighteen – Arkansas,

Connecticut, Delaware, District of Columbia, Idaho, Iowa, Kansas,

Maine, Massachusetts, Minnesota, Montana, Nebraska, Oregon,

Pennsylvania, Rhode Island, South Carolina, Utah, and Vermont –

required the denial of summary judgment. The judge also denied

summary judgment in cases governed by the law of two states – Ohio

and Oklahoma – because those states recognize an exception to the

learned intermediary doctrine for materials disseminated directly

to patients. Defendants' cross-appeal seeks reversal of the denial

 80 A-4760-14T1
of summary judgment in those cases governed by the law of those

twenty jurisdictions. We find insufficient merit in defendants'

arguments regarding those cases to warrant further discussion in

a written opinion. R. 2:11-3(e)(1)(E).

 Consequently, we turn to the other twenty-four jurisdictions

– as to which the judge granted summary judgment in defendants'

favor – and separately examine the judge's determinations as they

relate to: (1) three jurisdictions, which espouse, in the trial

judge's view, substantive law that is either "irrational" or

"unclear"; (2) fourteen jurisdictions in which the learned

intermediary doctrine had been adopted in a manner that, in the

judge's view, permitted a determination of a drug label's adequacy

as a matter of law; and (3) seven jurisdictions in which the

adequacy of the warning was viewed as determinable as a matter of

law for other reasons.

 (1) The First Group

 In cases where it was alleged plaintiffs resided and ingested

Accutane in Louisiana, Nebraska and South Dakota, the judge applied

New Jersey law for reasons other than those discussed earlier. We

reject those reasons and conclude, for the following reasons, the

judge was obligated to ascertain the law of those jurisdictions

and determine whether it permitted a disposition of the issues

 81 A-4760-14T1
presented as a matter of law.

 a. Louisiana

 We first consider Louisiana law, which the judge disregarded

because he found it "irrational."

 Courts that have applied the "Louisiana Products Liability

Act," La. Rev. Stat. Ann. § 9:2800.51-.60 (2016), have understood

that a drug manufacturer has "satisfied its duty to warn under the

learned intermediary doctrine," Stahl v. Novartis Pharms. Corp.,

283 F.3d 254, 268 (5th Cir.), cert. denied, 537 U.S. 824, 123 S.

Ct. 111, 154 L. Ed. 2d 34 (2002) – a circumstance that can be

decided in an appropriate case as a matter of law, Anderson v.

McNeilab, Inc., 831 F.2d 92, 93 (5th Cir. 1987) – when "a

particular adverse effect is clearly and unambiguously mentioned

in a warning label and the prescribing physician unequivocally

states that he or she was adequately informed of that risk by the

warning," Stahl, supra, 283 F.3d at 268.

 Here, the trial judge observed that "the net result" of such

a standard

 grants the prescribing physician what amounts
 to a veto on the adequacy of a drug label. If
 a competent physician read and understood the
 manufacturer's warnings, then the warning is
 adequate; if another physician is unable to
 "unequivocally state[] that he or she was
 inadequately informed of that risk by the
 warning" then the warning is inadequate. Such

 82 A-4760-14T1
 a subjective standard is incompatible with how
 New Jersey courts strive to adjudicate
 disputes.

 When the Legislature adopted the [PLA] it
 sought to level the courtroom floors and
 respect the rights of both consumers and
 manufacturers. When balancing the competing
 interests of Louisiana's apparent policy of
 protecting consumers by accepting or rejecting
 the adequacy of a drug label based on the
 observations of the prescribing physicians,
 anyone of whom may be more or less
 conscientious, informed or attentive than
 another, with New Jersey's interests in
 insuring that all its litigants be accorded a
 trial based upon predictable and rational
 standards, New Jersey's public policy
 interests prevail.

The judge concluded he would "not subject a New Jersey corporate

resident to such an irrational standard" and chose, instead, to

apply New Jersey law.

 This was erroneous. In conducting a choice-of-law analysis,

"it is the forum state's duty to disregard its own substantive

preference." Fu, supra, 160 N.J. at 131 (quoting O'Connor v. Busch

Gardens, 255 N.J. Super. 545, 550 (App. Div. 1992). The inquiry

does not concern whether Louisiana or New Jersey "passed the better

law; that is a normative judgment best suited for the legislative

process." Rowe, supra, 189 N.J. at 629. Louisiana law must apply

because New Jersey does not have a more significant relationship

under the principles stated in section 6 to the occurrence and the

parties.

 83 A-4760-14T1
 We conclude that summary judgment was not appropriate when

applying Louisiana law to cases in which Accutane was either

prescribed or ingested in Louisiana because defendants did not

demonstrate that the prescribing physicians had unequivocally

acknowledged receipt of an adequate warning.

 b. Nebraska and South Dakota

 The judge also applied New Jersey law in cases where

plaintiffs were injured in Nebraska and South Dakota, finding the

law of those states too sparse to apply.

 We suppose that, in a vacuum – if it could ever be concluded

there is "no law" on a subject – choice-of-law principles would

not apply because the absence of law would not conflict with a

forum's existing law. But, the mere fact that a state's courts and

legislature have not spoken on a particular topic doesn't mean

that state lacks legal principles that would illuminate the

disposition of a dispute. For example, even if it could be shown

the courts or legislature of a particular state never uttered any

product-liability principles, that state's view on the subject

could conceivably be extrapolated from other common-law principles

recognized by that jurisdiction. On the other hand, we don't

disagree that a state with sparse law on a subject may possess a

lesser interest in governing a dispute than another interested

 84 A-4760-14T1
state possessing well-established legal principles. This

circumstance, however, is merely a factor to be considered; it is

not conclusive. McCarrell II, supra, 227 N.J. at 596.

 Having said all that, we reject the trial judge's

determination that not enough has been said by the legislatures

or the courts of Nebraska and South Dakota to allow an accurate

understanding of their substantive law on the subject. To the

contrary, Nebraska's highest court has observed that failure-to-

warn claims sound in negligence and strict liability and has also

recognized and applied the learned intermediary doctrine in a

claim based on the ingestion of Accutane. Freeman v. Hoffman-La

Roche, Inc., 618 N.W.2d 827, 842 (Neb. 2000).

 Similarly, in South Dakota, S.D. Codified Laws § 20-9-10.1

(2016) provides that:

 In any product liability action based upon
 negligence or strict liability, whether the
 design, manufacture, inspection, testing,
 packaging, warning, or labeling was in
 conformity with the generally recognized and
 prevailing state of the art existing at the
 time the specific product involved was first
 sold to any person not engaged in the business
 of selling such a product, may be considered
 in determining the standard of care, whether
 the standard of care was breached or whether
 the product was in a defective condition or
 unreasonably dangerous to the user.

In South Dakota, a manufacturer has "a duty to warn based on what

it knew or should have known at the time the drug was administered

 85 A-4760-14T1
to plaintiff." McElhaney v. Eli Lilly & Co., 575 F. Supp. 228, 231

(D.S.D. 1983), aff'd, 739 F.2d 340 (8th Cir. 1984). And federal

courts applying South Dakota law have utilized the learned

intermediary doctrine. Ibid.; Yarrow v. Sterling Drug, Inc., 263

F. Supp. 159, 162 (D.S.D. 1967), aff'd, 408 F.2d 978 (8th Cir.

1969).

 From these principles, we conclude that, under both Nebraska

and South Dakota law, plaintiffs presented sufficient evidence to

demonstrate a genuine dispute about whether the warnings were

accurate, clear and unambiguous and that those plaintiffs

presented evidence that defendants knew but failed to warn of a

causal and latency effect. We conclude the judge erred in

dismissing the cases governed by Nebraska or South Dakota law.

 (2) The Second Group

 We find reasons to distinguish among the fourteen

jurisdictions that adopted the learned intermediary doctrine19 as

19
 Each of these fourteen jurisdictions has adopted the learned
intermediary doctrine. See Stone v. Smith, Kline & French Labs.,
447 So. 2d 1301, 1305 (Ala. 1984); Carlin v. Superior Court, 920
P.2d 1347, 1348-54 (Cal. 1996); O'Connell v. Biomet, Inc., 250
P.3d 1278, 1281 (Colo. App. 2010); Felix v. Hoffmann-La Roche,
Inc., 540 So.2d 102, 104 (Fla. 1989); Presto v. Sandoz Pharms.
Corp., 487 S.E.2d 70, 73 (Ga. Ct. App. 1997); Kirk v. Michael
Reese Hosp. & Med. Ctr., 513 N.E.2d 387, 393 (Ill. 1987); Tucker
v. SmithKline Beecham Corp., 701 F. Supp. 2d 1040, 1066 (S.D. Ind.
2010); Hyman & Armstrong, P.S.C. v. Gunderson, 279 S.W.3d 93, 109

 86 A-4760-14T1
to which the trial judge granted summary judgment. Consequently,

we break this group into two smaller groups: (a) one group that

requires reversal, and (b) a second that requires affirmance.

 a. Alabama, Florida, Georgia,
 Illinois, Kentucky, Puerto Rico,
 Tennessee, and Washington

 Products liability law in Alabama is governed by the

judicially-created Alabama Extended Manufacturer's Liability

Doctrine (AEMLD). Atkins v. Am. Motors Corp., 335 So. 2d 134, 137

(Ala. 1976); Casrell v. Altec Indus., Inc., 335 So. 2d 128, 130

(Ala. 1976). Here, the trial judge relied on Morguson v. 3M Co.,

857 So. 2d 796, 802 (Ala. 2003), where the court held in a medical

device case that the warning was adequate as a matter of law

because it warned "against the exact acts and errors committed"

by the hospital staff in assembling the device; we find this

circumstance to be distinguishable. We also observe that our

Supreme Court has rejected defendants' argument under either New

Jersey or Alabama law that the 1984 label, which specifically

referred to IBD, was adequate as a matter of law. McCarrell I,

(Ky. 2008); Janssen Pharmaceutica, Inc. v. Bailey, 878 So.2d 31,
58 (Miss. 2004); Martin v. Hacker, 628 N.E.2d 1308, 1311 (N.Y.
1993); De Oca v. Adventis Pharma, 579 F. Supp. 2d 222, 227 (D.P.R.
2008); Pittman v. Upjohn Co., 890 S.W.2d 425, 429 (Tenn. 1994);
Pfizer, Inc. v. Jones, 272 S.E.2d 43, 44 (Va. 1980); Estate of
LaMontagne v. Bristol Meyers Squibb, 111 P.3d 857, 862 (Wash. Ct.
App. 2005).

 87 A-4760-14T1
supra, slip op. at 108. These same principles require a reversal

of the summary judgment entered in the thirteen cases governed by

Alabama law.

 In this setting, Florida law requires that a plaintiff prove

a manufacturer "did not adequately warn of a particular risk that

was known or knowable in light of the generally recognized and

prevailing best scientific and medical knowledge available at the

time of the manufacture and distribution." Thomas v. Bombardier

Rec. Prods. Inc., 682 F. Supp. 2d 1297, 1300 (M.D. Fla. 2010). In

determining the adequacy of the warning under Florida law, the

critical inquiry is whether it was adequate to warn the physician

of the possibility that the drug caused the plaintiff's injury.

Upjohn Co. v. MacMurdo, 562 So. 2d 680, 683 (Fla. 1990). "The

sufficiency and reasonableness of the warnings are questions of

fact best left for the jury unless the warnings are accurate,

clear, and unambiguous." Thomas, supra, 682 F. Supp. 2d at 1300.

Consequently, the judge erred in dismissing thirty-nine cases

under Florida law because, as discussed earlier in this opinion,

plaintiffs presented evidence that the warnings were not accurate,

clear and unambiguous.

 In Georgia, the "manufacturer's duty to warn is limited to

an obligation to advise the prescribing physician of any potential

dangers that may result from the drug's use." Bryant v. Hoffmann-

 88 A-4760-14T1
La Roche, Inc., 585 S.E.2d 723, 730 (Ga. Ct. App. 2003) (quoting

Hawkins v. Richardson-Merrell, Inc., 249 S.E.2d 286, 288 (Ga. Ct.

App. 1978)). Georgia law also recognizes that "[t]he adequacy of

drug warnings is generally a question of fact, but it can 'become

a question of law where the warning is accurate, clear and

unambiguous.'" Weilbrenner v. Teva Pharms. USA, Inc., 696 F. Supp.

2d 1329, 1339 (M.D. Ga. 2010) (quoting Thom v. Bristol-Meyers

Squibb Co., 353 F.3d 848, 853 (10th Cir. 2003). Nevertheless, we

conclude the judge erred in dismissing twenty-four claims governed

by Georgia law because plaintiffs presented sufficient evidence

that the warnings were not accurate, clear and unambiguous.

 In Illinois, "[t]he duty to warn of the dangers of

prescription drugs is owed to the physician, and therefore, the

adequacy of the warning must be judged by whether it sufficiently

apprises physicians of the risks associated with the use of the

drug." Hernandez v. Schering Corp., 958 N.E.2d 447, 455 (Ill. App.

Ct. 2011). Although "[t]he sufficiency of the warning can become

a question of law where the warning is clear, accurate and

unambiguous," ibid., for the reasons already outlined regarding

the other jurisdictions in this group, we conclude that the judge

erred in dismissing twenty-six cases under Illinois law;

plaintiffs presented sufficient evidence that the warnings were

not accurate, clear and unambiguous.

 89 A-4760-14T1
 In Larkin v. Pfizer, Inc., 153 S.W.3d 758, 764 (Ky. 2004),

Kentucky's highest court has recognized that an adequate warning

is that which "sufficient[ly] [] apprise[s] the general

practitioner as well as the 'unusually sophisticated medical man'

of the dangerous propensities of the drug," McEwen v. Ortho Pharm.

Corp., 528 P.2d 522, 529 (Or. 1974) (quoting Parke-Davis & Co. v.

Stromsodt, 411 F.2d 1390, 1400 (9th Cir. 1969)). It is, the Court

held, "incumbent upon the manufacturer to bring the warning home

to the doctor." Larkin, supra, 153 S.W.3d at 764. The judge erred

in dismissing twelve cases under Kentucky law because plaintiffs

presented sufficient evidence that defendants did not "bring the

warning home" to the prescribing physician as to Accutane's

causative effect.

 In Puerto Rico, a plaintiff must prove in a products liability

case that "(1) the manufacturer knew, or should have known of the

risk inherent in the product; (2) there were no warnings or

instructions, or those provided were inadequate; (3) the absence

of warnings made the product inherently dangerous; (4) the absence

of adequate warnings or instructions was the proximate cause of

plaintiff's injury." Cruz-Vargas v. R.J. Reynolds Tobacco Co., 348

F.3d 271, 276 (1st Cir. 2003), cert. denied, 543 U.S. 959, 125 S.

Ct. 413, 160 L. Ed. 2d 323 (2004).

 "If the warning should suffice to alert the general

 90 A-4760-14T1
practitioner as well as the specialist, it is adequate, and the

manufacturer is not liable for the injuries caused by the drug."

Guevara v. Dorsey Labs., Div. of Sandoz, Inc., 845 F.2d 364, 367

(1st Cir. 1988).

 The judge erred in dismissing one case under the law of Puerto

Rico because there was sufficient evidence, including expert and

other testimony, that the warnings were not accurate, clear and

unambiguous to submit the question to the jury.

 In Tennessee, products liability is governed by statute.

Tenn. Code Ann. § 29-28-104 (2016) provides:

 Compliance by a manufacturer or seller with
 any federal or state statute or administrative
 regulation existing at the time a product was
 manufactured and prescribing standards for
 design, inspection, testing, manufacture,
 labeling, warning or instructions for use of
 a product, shall raise a rebuttable
 presumption that the product is not in an
 unreasonably dangerous condition in regard to
 matters covered by these standards.

 "Warnings concerning prescription drugs generally are

adequate when they contain a full and complete disclosure of the

potential adverse reactions to the drug." Pittman, supra, 579 F.

Supp. 2d at 429. The adequacy of a drug manufacturer's warnings

is usually a question of fact. Ibid. "It becomes a question of law

only when the instructions are accurate and unambiguous." Ibid.

"[A]ll causation issues, are 'ordinarily jury questions, unless

 91 A-4760-14T1
the uncontroverted facts and inferences to be drawn from them make

it so clear that all reasonable persons must agree on the proper

outcome.'" Payne v. Novartis Pharms. Corp., 767 F.3d 526, 528 (6th

Cir. 2014) (quoting Haynes v. Hamilton Cty., 883 S.W.2d 606, 612

(Tenn. 1994)). The judge erred in dismissing eighteen cases under

Tennessee law because there was enough evidence to support the

contention that the warnings were not sufficiently accurate or

clear to require disposition of that question by the factfinder.

 In Washington, products liability is governed by Wash. Rev.

Code Ann. § 7.72 to 7.72.070 (2016). "A warning for a prescription

drug may be adequate as a matter of law if it provides specific

and detailed information about the risks of using the drug."

Estate of LaMontagne, supra, 111 P.3d at 862. But "[b]ecause the

FDA regulations provide only the minimum requirements for drug

manufacturers, compliance with those regulations does not

necessarily establish warnings were adequate." Ibid. Instead,

"[t]o determine whether a warning is adequate requires an analysis

of the warnings as a whole and the language used in the package

insert." Laisure-Radke v. PAR Pharm., Inc., 426 F. Supp. 2d 1163,

1172 (W.D. Wash. 2006). A court "must examine the meaning and

context of the language and the manner of expression to determine

if the warning is accurate, clear and consistent and whether the

warning portrays the risks involved in taking the prescription

 92 A-4760-14T1
drug." Ibid. In light of this fact-sensitive issue, we conclude

that the judge erred in dismissing nineteen cases governed by

Washington law.

 b. California, Colorado,
 Indiana, Maryland, Mississippi,
 New York, Texas, and Virginia

 With the exception of Texas, which we discuss separately,

these other jurisdictions all possess similar legal principles.

And each applies the learned intermediary doctrine. See cases

cited in footnote 17, supra. For the reasons that follow, we affirm

the summary judgment entered in favor of defendants in the cases

governed by the law of these jurisdictions.

 Under California law, prescription-drug manufacturers are

strictly liable for injuries caused by a failure to warn of a

product's known or reasonably, scientifically-knowable, dangerous

propensities available when manufactured and distributed. Johnson

v. Am. Standard, Inc., 179 P.3d 905, 910 (Cal. 2008). This

obligation has been interpreted, as a matter of California law,

to require a determination that a drug warning is adequate as a

matter of law if it directly warns "in plain and explicit terms"

of the specific risk that has caused injury. Kearl v. Lederle

Labs., 218 Cal. Rptr. 453, 467 (Cal. Ct. App. 1985), disapproved

on other grounds, Brown v. Superior Court, 751 P.2d 470, 482 (Cal.

 93 A-4760-14T1
1988).

 Notably, in the MDL Accutane case, the federal district court

granted defendants' motion for summary judgment under California

law on the adequacy of later IBD warnings, In re Accutane Prods.

Liab., No. MDL 1626, 2014 U.S. Dist. LEXIS 155313, at *15 (M.D.

Fla. Sep. 23, 2014), finding:

 The Physician Package Insert plainly and
 prominently identified inflammatory bowel
 disease by name as a possible consequence of
 taking isotretinoin. This risk information
 appeared in the "WARNINGS" and "ADVERSE
 REACTIONS" sections of the insert. It also
 identified the common symptoms of IBD and
 instructed what should be done if those
 symptoms appeared. Likewise, the Medication
 Guide warned that isotretinoin may result in
 permanent damage to the bowels. The Medication
 Guide and patient brochures also broadly
 communicated that isotretinoin "can cause"
 serious side effects and proceeded to list
 permanent damage to various organs, including
 the bowels, among such potential serious side
 effects. This language tracked the WARNINGS
 section of the Physician Package Insert, which
 notified physicians that isotretinoin "has
 been associated with" IBD. Both independently
 and taken together, these formulations
 communicated the same essential message to
 prescribing physicians: IBD is a potential
 risk of isotretinoin. Accordingly, under
 California law, summary judgment is
 appropriate as a matter of law under these
 circumstances.

 [Id. at *14-15.]

We view the law of the other jurisdictions in this group –

Colorado, Caveny v. Ciba-Geigy Corp., 818 F. Supp. 1404, 1406 (D.

 94 A-4760-14T1
Colo. 1992); Indiana, Tucker, supra, 701 F. Supp. 2d at 1066;

Maryland, Nolan v. Dillon, 276 A.2d 36, 40 (Md. 1971); Mississippi,

Austin v. Will-Burt Co., 361 F.3d 862, 868 (5th Cir. 2004); New

York, Martin, supra, 628 N.E.2d at 1312-13; and Virginia, Ball v.

Takeda Pharms. Am., Inc., 963 F. Supp. 2d 497, 504 (E.D. Va. 2013)

– to require the same result. It is enough in these jurisdictions

that IBD was referenced to render the warning adequate as a matter

of law.

 In Texas, the adequacy of a product's warning generally

presents a fact question. Murthy v. Abbott Labs., 847 F. Supp. 2d

958, 968 (S.D. Tex. 2012) (citing McNeil v. Wyeth, 462 F.3d 364,

368 (5th Cir. 2006)). "In prescription drug cases involving the

learned intermediary doctrine," however, a warning that

"specifically mentions the circumstances complained of" is

adequate as a matter of law, ibid., as in the other jurisdictions

contained in this particular grouping. But Texas also has a

statutory rebuttable presumption of adequacy for prescription

drugs, Tex. Civ. Prac. & Rem. § 82.007 (2015), which can be

rebutted only if a plaintiff can show: (1) the defendant "withheld

from or misrepresented to" the FDA "required information that was

material and relevant to the performance of the product and was

causally related to the claimant's injury"; (2) the product was

sold or prescribed "after the effective date of an order" to remove

 95 A-4760-14T1
it from the market; (3) the defendant engaged in off-label

promotion that was causally related to the plaintiff's injury; and

(4) the defendant engaged in criminal violation of federal anti-

bribery law. So heavy is this burden, that even if a plaintiff

could show a defendant withheld information about causation,

permanency, and latency from the FDA, the action could proceed

only if the FDA itself found fraud. Lofton v. McNeil Consumer &

Specialty Pharms., 672 F.3d 372, 381 (5th Cir. 2012); Willis v.

Alaven Pharm. LLC, 62 F. Supp. 3d 560, 563 (E.D. Tex. 2014). There

is no evidence in this record that would support a principled

basis for overcoming Texas's unique statutory presumption.

 We, thus, affirm the summary judgment entered in favor of

defendants insofar as it dismissed the cases governed by the

substantive law of this subgroup.

 (3) The Third Group

 The trial judge granted summary judgment under the laws of

the seven states that make up our third and final group.20 We find

20
 These jurisdictions recognize the learned intermediary doctrine.
See Doe v. Alpha Therapeutic Corp., 3 S.W.3d 404, 419 (Mo. Ct.
App. 1999); Brochu v. Ortho Pharm. Corp., 642 F.2d 652, 656 (1st
Cir. 1981) (applying New Hampshire law); Ehlis v. Shire Richwood,
Inc., 233 F. Supp. 2d 1189, 1196 (D.N.D. 2002) (applying North
Dakota law), aff'd, 367 F.3d 1013 (8th Cir. 2004); Menges v. Depuy
Motech, Inc., 61 F. Supp. 2d 817, 830 (N.D. Ind. 1999) (applying
Wisconsin law); Thom, supra, 353 F.3d at 852 (applying Wyoming
law).

 96 A-4760-14T1
the substantive law of this group – Missouri, New Hampshire, North

Dakota, Wisconsin and Wyoming – to be similar and, for the reasons

that follow, conclude for the reasons that briefly follow that the

judge erred in granting summary judgment in cases governed by the

law of those jurisdictions.

 In Missouri, the focus in a failure-to-warn case rests "on

what the manufacturer knew rather than on the product." Moore v.

Ford Motor Co., 332 S.W.3d 749, 764 (Mo. 2011). In addition,

"Missouri courts have held that in cases involving manufacturers

of prescription drugs, the manufacturer has 'a duty to properly

warn the doctor of the dangers involved and it is incumbent upon

the manufacturer to bring the warning home to the doctor.'" Doe,

supra, 3 S.W.3d at 419 (quoting Krug v. Sterling Drug, Inc., 416

S.W.2d 143, 146 (Mo. 1967)). Our discussion of the factual record

in the earlier part of this opinion demonstrates plaintiffs

presented evidence that the warning failed to "bring home to the

doctor" latency, permanency and causation.

 In New Hampshire, "[t]he duty to warn is concomitant with the

general duty of the manufacturer, which 'is limited to foreseeing

the probable results of the normal use of the product or a use

that can reasonably be anticipated.'" Thibault v. Sears, Roebuck

& Co., 395 A.2d 843, 847 (N.H. 1978) (quoting McLaughlin v. Sears,

Roebuck & Co., 281 A.2d 587, 588 (1971)). "An adequate warning is

 97 A-4760-14T1
one reasonable under the circumstances." Brochu, supra, 642 F.2d

at 657. "A warning may be inadequate in factual content, in

expression of the facts, or in the method by which it is conveyed."

Ibid. So stated, we view the application of New Hampshire law to

the warnings in question as generated a question of fact for a

jury to determine.

 North Dakota law holds that "in order to be adequate the

warning must satisfactorily convey the seriousness of the danger

such that a reasonable physician would be alerted to the danger."

Ehlis, supra, 233 F. Supp. 2d at 1196. Again, plaintiffs presented

evidence that the warning failed to convey the seriousness of the

danger.

 Wisconsin has adopted comments g and i to Restatement (Second)

of Torts § 402A (1965), which explain "that a product is defective

if it is 'in a condition not contemplated by the ultimate consumer,

which will be unreasonably dangerous to him [or her]'; and that

for a product to be considered 'unreasonably dangerous,' it must

be 'dangerous to an extent beyond that which would be contemplated

by the ordinary consumer who purchases it, with the ordinary

knowledge common to the community as to its characteristics.'"

Mohr v. St. Paul Fire & Marine Ins. Co., 674 N.W.2d 576, 589 (Wis.

Ct. App. 2003).

 "Although compliance with FDA standards generally will

 98 A-4760-14T1
foreclose negligence per se, . . . such compliance . . . does not

preclude a finding of negligence." Kurer v. Parke, Davis & Co.,

679 N.W.2d 867, 876 (Wis. Ct. App. 2004). And, "[w]hether a warning

is adequate is generally an issue of fact to be determined by the

jury." Mohr, supra, 674 N.W.2d at 589. A warning may be found

adequate as a matter of law only when the warning "[c]learly and

repeatedly" warns of the risks associated with the drug. See Kurer,

supra, 679 N.W.2d at 878 (emphasis added). Here, plaintiffs

presented sufficient evidence that the warnings did not clearly

or repeatedly warn of the causal and latency effect.

 In Wyoming, "a plaintiff may show a 'defect' by establishing

that the manufacturer failed to warn about dangers associated with

the product." Rohde v. Smiths Med., 165 P.3d 433, 441 (Wyo. 2007).

"[A] drug manufacturer is required to warn only of those adverse

effects of which it knows or reasonably should know." Jacobs v.

Dista Prob. Co., 693 F. Supp. 1029, 1033 (D. Wyo. 1988). But

"[i]mplicit in this holding is a continuing duty of drug

manufacturers to provide notification of side effects subsequently

discovered." Id. at 1034.

 "Although the adequacy of warnings concerning drugs is

generally a question of fact, it can 'become a question of law

where the warning is accurate, clear and unambiguous.'" Thom,

supra, 353 F.3d at 853 (quoting Felix, supra, 540 So. 2d at 105).

 99 A-4760-14T1
For the reasons expressed regarding other jurisdictions with a

similar approach, we find the judge erred in granting summary

judgment on cases governed by Wyoming law.

 III

 To briefly summarize our holdings in both appeals, we reverse

the summary judgment entered in A-4760-14, and we reverse in part

and affirm in part the order granting summary judgment in A-0164-

15.

 100 A-4760-14T1